In re Billy W. POTEET and Rebecca A. Poteet, Debtors.

RANIER BANK, Visa Card Division, Plaintiffs,

v.

Billy W. POTEET and Rebecca A. Poteet, Defendants.

Bankruptcy No. 580–00069.
Adv. No. 580–0107.

United States Bankruptcy Court,
N. D. Texas,
Lubbock Division.

July 16, 1981.

Aubrey J. Fouts, Lubbock, Tex., for debtors.

Walker Metcalf, Lubbock, Tex., for the bank.

R. Byrn Bass, Jr., Lubbock, Tex., trustee.

## MEMORANDUM AND ORDER

BILL H. BRISTER, Bankruptcy Judge.

Debtors, Billy W. Poteet and Rebecca A. Poteet, filed petition for order for relief pursuant to Chapter 7 of Title 11, United States Code, on August 26, 1980. During the two month period immediately preceding the filing of the petition the debtors made an unusual amount of purchases with VISA cards which Ranier Bank had issued to them approximately ten years earlier. Ranier Bank, VISA Card Division, filed complaint against the debtors, challenging the dischargeability of its debt pursuant to 11 U.S.C. § 523(a)(2)(A). Nonjury trial was conducted on May 29, 1981. The following summary constitutes the findings of fact required by Rule 752.

The maximum charges authorized on the VISA card, including carryover debt and new purchases, was $2,500.00 per month. From the time the card was issued ten years earlier through June 1980, the debtors had never exceeded the maximum authorized charge. The testimony indicated that a search of the monthly statements from the time the cards were issued through June 1980, reflected that the maximum charge for any month during that period approximated $1,800.00.

The debtors did not always pay the balance as shown on the statement, but, until

the challenged charges were made, they kept the account in good standing by making at least the minimum required payment each month. For instance, the statement with closing date of December 21, 1979, which was due January 15, 1980, showed carryover indebtedness of $720.71 with minimum payment made of $36.00 and the January 21, 1980, statement showed prior balance of $886.58, upon which $100.00 had been paid. The succeeding statements reflect that the balance on each statement was creeping upward, but that the minimum payment was made each month. The June 23, 1980, statement reflected balance of $1,536.13 and the statement issued July 21, 1980, reflected balance of $1,521.34. That July 21, 1980, statement was the last statement which did not reflect unusual activity. Some of the charges which are in issue in this case were made during that period, but were not processed until the August 1980, statement.

Almost overnight the account changed from a "good account" to a "very poor account." Between July 1, 1980, and August 18, 1980, the debtors charged purchases totalling $6,653.65,[1] making the total owed at the end of that period $8,174.99, exclusive of interest and other finance charges. The total of those purchases was far more than twice the amount of the purchases in any previous two month period. Most of the purchases appear to be from stores where the items sold were likely to be clothing. However, the invoices show that the purchases covered the spectrum of merchandise, most of which cannot be considered to be necessities of life. Certainly the purchases were not of the type which one having financial difficulties would reasonably make.

■ The bank insists that its total debt of $8,174.99 should be declared nondis-

chargeable, because the purchases were made by the debtors with full knowledge that they would not be able to pay for them, they knew or should have known their assigned credit limit, and that they knowingly and intentionally incurred charges in excess of their assigned credit limit during the time in question. However, to bring a credit card obligation within § 523(a)(2)(A), something more than merely exceeding the authorized credit limit must be shown. *In re Victorian*, Bkrtcy. N.D.Ohio, 1981, 8 B.R. 196, 198.

■ 11 U.S.C. § 523(a)(2)(A) excepts from discharge any debt for obtaining money, property, or services by false pretenses, a false representation, or actual fraud. That section represents little change from the provisions of § 17(a)(2) of the Bankruptcy Act. The bank must establish that the debtors (1) made a materially false representation, (2) with the intent to defraud, and (3) that the bank relied on that false representation. *Matter of Ratajczak*, Bkrtcy.M.D.Fla., 1980, 5 B.R. 583, 586.

■ A representation was at least symbolically made by the debtors each time they used the credit card to make a purchase. The purchase of merchandise by the use of a credit card is an implied representation to the merchant and to the issuer of the card that the buyer has the means and the intentions to pay for the purchase. It is apparent, also, that the element of reliance is present. With a payment record of ten years the debtors had engaged in a course of conduct and had represented themselves in a manner so that the bank reasonably relied upon the debtors continuing to comply with their implied representation to pay for each purchase. These conclusions are supported by language in *Matter of Black*, E.D.Wis.1974, 373 F.Supp. 105, 107, where

1. The claims filed in this bankruptcy proceeding show that, in addition to the charges made on the VISA card during that period, the debtors had purchased a microwave oven and a refrigerator from Woolco on July 25, 1980, with an unpaid balance of $1,101.35, unidentified merchandise from Montgomery Wards on July 26, 1980, with unpaid balance of $1,017.26 and merchandise from J. C. Penney Co. in July with

unpaid balance of $720.42. The debtors scheduled unsecured debts owed for credit purchases from Dillards Department Store of $300.00 and Sears, Roebuck & Co. of $1,368.40. Neither of those creditors filed proof of claim, so determination cannot be made as to whether those debts were incurred during the July-August 1980, period.

the district judge, faced with similar facts, noted:

"Each time they presented their credit cards and signatures for the purchases in question, the Blacks impliedly represented to Kohl's that they had the wherewithal, as well as the intention, to pay for them. To the extent that they had kept their Kohl's credit account current until then, the Blacks engaged in a course of conduct and represented themselves in a manner upon which Kohl's relied. The Blacks' active purchasing conduct and the symbolic representations involved in the use of their credit card constituted a form of fraud on the store. Had the Blacks represented, orally or in a separate writing, at the time of their purchases that they could and would pay for them, it is clear that such representations would have been false for purposes of § 17a(2). The fact that they utilized their credit cards and signatures alone should not change the result."

■ However, the symbolic representation by use of the credit card, accompanied with the bank's reliance, does not, without more, establish the bank's right to recover. The interwoven requirements of demonstrating the falsity of the representation and fraudulent intent must be established.

In a long standing decision this circuit has held that the mere purchase of goods on credit without present intention of paying for those goods does not make the debt nondischargeable, and requires that *explicit* false representations concerning financial condition must be made by the debtor before the debt is rendered nondischargeable. *Davison-Paxon Company v. Caldwell*, 5th Cir. 1940, 115 F.2d 189, cert. den. 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941). Recent cases have not been required to squarely face the issue and found other bases for decision. *Matter of Wood*, 5th Cir. 1978, 571 F.2d 284, 285; *Matter of Boydston*, 5th Cir. 1975, 520 F.2d 1098, 1101. The court in *Boydston* noted:

"The referee and district judge both noted that our decision in *Davison-Paxon v. Caldwell* would mandate a discharge in this case even if the Boydston had no intention of paying for the merchandise.

In that case we held that purchasing goods on credit with no present intention of paying for them was not embraced by the Act's proscription against obtaining property by false pretenses or representations. Debts created through credit purchases while concealing insolvencies or inability to pay were found to be dischargeable. *The rationale underlying Davison-Paxon has been severely eroded in the modern world of credit transactions and the decision has been the subject of much criticism.*" (Emphasis added).

There was rational support for the decision in *Davison-Paxon* at the time it was delivered in 1940. At that time a credit transaction was primarily a personal one between the debtor and the creditor, or between the buyer and the seller, with face-to-face confrontation. There was opportunity for the issuer of credit to make personal inquiry of the debtor at the time each credit transaction was made. The changes required by the subsequent development of the credit card system is apparent. In this area the issuer of credit is the bank, which is frequently located many miles from the place where the purchase with the credit card is made. It is unrealistic to require an overt expression on the part of the purchaser to both the seller and to the bank that he is solvent and intends to pay for the purchase each time that he uses the credit card. The *Davison-Paxon* requirements are no longer relevant to the credit transactions of the type involved in this case and are rejected.

Resolution of this case depends upon whether the symbolic representations were materially false and whether fraudulent intent existed on the part of the debtors. Where, as here, there is no overt expression of means and intent, and the symbolic expression by use of the credit card is relied upon, that determination must necessarily be subjective.

■ Where hopeless insolvency at the time of the purchase makes payment impossible, fraudulent intent may be inferred. *In re Boydston*, supra, at 1101. However, the bank did not establish that the debtors

were hopelessly insolvent at the time of the purchases. It did obtain admissions from the debtors that since at least early 1980 they were in a financial strain. Rebecca Poteet testified that they always had a money crunch and that they were having financial problems for the two month period before bankruptcy was filed. That was the period during which the challenged credit purchases were made. However, there has been no satisfactory showing of hopeless insolvency. Other evidence of subjective intent not to pay must be produced.

■ In my opinion the bank has met its burden to show the falsity of the symbolic representation and fraudulent intent by its development of the pattern which the debtors utilized in making the purchases. The bank insists that the debtors had split purchases into separate drafts in order that the VISA computer would not be triggered by calls from merchants seeking clearance of proposed purchases. Most stores which permit payment of purchases with the VISA card have a policy of calling a telephone number supplied by VISA to obtain authorization before permitting a credit card purchase where the proposed purchase exceeds a particular sum of money. That sum is not standard, but the typical figure, and the one most frequently used by stores in this area, which triggers a call to the VISA number is $50.00. According to the bank, debtors who try to conceal from VISA that they are exceeding the credit limit use a system of spreading large purchases over a number of drafts, known as "splitting drafts." The bank insists that the debtors had split purchases into separate drafts during the period July 1, 1980, through August 18, 1980, in order that the VISA number would not be called by the different merchants and thus the computer would not reflect the unusual activity by the account.

The exhibits attached to the bank's complaint support the bank's theory. In response to requests for admissions and interrogatories, the debtors have acknowledged that those exhibits accurately reflect their purchases. During that period from July 1, 1980 through August 18, 1980, the debtors made 269 separate purchases of merchandise on the VISA card. Only nine of those invoices represent purchases for more than $50.00, and those nine charges were made during the period from July 18, 1980, to July 29, 1980, when, according to the July statement, the authorized $2,500.00 limit would not have been exceeded. The exhibits show that on almost a daily basis during that period the debtors spread purchases from the same store over a number of drafts. For instance, on July 18, 1980, they used nine separate drafts in making purchases totalling $193.98 from C. R. Anthony Company, a department store, on July 26, 1980, they used five separate drafts in making purchases totalling $115.25 from Dunlaps, a department store, on July 28, 1980, they used five separate drafts in making purchases totalling $147.30 from J. C. Penney Company—a store at which they also had a charge account—and on July 29, 1980, they used three more separate drafts in making purchases totalling $72.98 from J. C. Penney Co. The pattern continued—six separate drafts were issued on purchases totalling $98.64 from Dunlaps on July 31, 1981, two drafts were issued to Sweetbriar Shoe Department for purchases totalling $58.80 on August 2, 1980, and so on. The most remarkable example is shown on August 5, 1980, when the debtors used ten separate drafts to purchase merchandise with value of $198.10 from Thornton's Department Store in Abilene, Texas. In fact the exhibit, which contains twenty pages of charges made on the VISA card by the debtors during that period, shows time and again that multiple charges were made on split drafts from the same store on almost a daily basis.

The statements for the months prior to July 1980, do not evidence that pattern of making purchases on split drafts. The debtors did not explain why they made purchases in July and August in that manner nor did they explain why they used the VISA card to make purchases in stores where they had charge accounts. Their only defense was the testimony by Billy W. Poteet that he intended to pay for each of the purchases at the time the purchases were made and that he did not know that they had exceeded the maximum limit of $2,500.00.

I am unpersuaded by those protestations of intent to pay and lack of knowledge. For ten years the debtors had a record of satisfactory payment of their VISA charges. The conclusion is inescapable that they went on the spending spree in July and August, 1980, with the intention to charge as much as possible before the bank suspended their operation. Those charges made prior to July 1980, in the sum of $1,521.34 as reflected on the July 21, 1980, statement were not shown to be a part of the spending spree and should be discharged. However, those purchases totalling $6,653.65 made with the VISA card during the period July 1, 1980, through August 18, 1980, represent money, property, or services obtained as a result of false pretenses, a false representation or actual fraud and should not be discharged.

LET JUDGMENT BE ENTERED ACCORDINGLY.

The clerk is directed to file this order and to furnish a copy to each attorney of record.