**In re James Thomas PREECE and Kathleen Susan Preece, Debtors.**

**FIRST DEPOSIT CREDIT SERVICES CORPORATION, Plaintiff,**

**v.**

**James Thomas PREECE, Defendant.**

**Bankruptcy No. 90–11456–FM.**
**Adv. No. 90–1260–FM.**

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

March 21, 1991.

Elizabeth J. Hickson, F.E. Walker & Associates, P.C., Austin, Tex., for defendant.

Dale Ellis, Houston, Tex., for plaintiff.

## MEMORANDUM OPINION

FRANK R. MONROE, Bankruptcy Judge.

The trial of this adversary proceeding occurred on March 4, 1991. At the conclusion of the trial, the Court made certain Findings of Fact and Conclusions of Law on the record pursuant to Bankruptcy Rule 7052. Those Findings and Conclusions are incorporated herein by reference and are relied upon in arriving at the ultimate judgment.

This Court has jurisdiction under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and (b)(1), and the standing Order of Reference existing in this District. This is core proceeding under 28 U.S.C. § 157(b)(2)(I) as it is a proceeding under 11 U.S.C. § 523(a)(2)(A) and (B) to obtain a judgment of nondischargeability with regard to an indebtedness owed by the Defendant to the Plaintiff.

### Factual Background

The Defendant was the Vice President of Quality Control and Manufacturing Operations beginning May 1988 for a company in California named Aero Scientific, a subsidiary of Data Design Labs. On or about April 10, 1989, the Debtor made application for a Gold First Select Visa card with the Plaintiff with a $5,000.00 credit limit pursuant to an unsolicited application he had received from the Plaintiff. When received, the Debtor filled out the application which requested only minimal financial disclosures and sent it back to the Plaintiff who pulled credit bureau reports on the Debtor, reviewed both the reports and the application, conducted a telephone interview with the Debtor to verify basic information, and, based thereon, made a decision to issue the Visa card to the Debtor with a $5,000.00 credit limit. It is interesting to note that one of the conditions of issuance of the card was that the Debtor was required to receive an immediate $5,000.00 cash advance at the time of the issuance of the card.

The only financial information requested of the Debtor on the credit card application was his annual household income ($80,-000.00), if he owned his own home (yes), his length of residence there (one year), and his length of employment (one year). The application was dated April 10, 1989, and was sent in by the Debtor on or before that date.

Unfortunately for the Debtor he was terminated by his employer on April 14, 1989, without prior reason to believe or knowledge that such was going to occur. The approval of his April 10, 1989 credit application was made by Plaintiff on April 17, 1989 and Plaintiff mailed the Debtor the Visa card and the initial mandatory $5,000.00 cash advance. This indebtedness was paid in full by the Debtor on September 20, 1989 from proceeds the Debtor received from the sale of his homes in California and New Hampshire (the Debtor's residence prior to moving to California).

In the summer of 1989, the Debtor moved to Round Rock, Texas where he and his wife purchased a children's learning center with a $10,000.00 down payment and execution of a $25,000.00 note. The source of the cash down payment was the sale of the Debtor's homes in California and New Hampshire.

Almost immediately the Debtor realized that the business he had purchased was not doing as well as had been represented. In fact, it was not generating a positive cash flow. Plus, a significant increase in enrollment was necessary in order for a profitable operation to result. Although enrollment did slowly increase, it never increased enough to allow the business to turn the corner. In fact, no profitable month occurred until after the Debtor first contacted an attorney in late January, 1990, concerning the tax ramifications from the sale of his homes and his use of the proceeds therefrom and for general information concerning bankruptcy.

From the time the Debtor lost his job in California until the time he filed for bankruptcy, a little over one year later, the Debtor received no income from any type of employment. And, in addition to his business not generating any net cash flow, he owned an undivided one-half interest in

three rent houses in Round Rock which were also producing negative cash flows.

Therefore, after the proceeds of the home sales were gone sometime in September 1989, the Debtor continued to exist only by borrowing. The borrowing was necessary to provide money to pay his family's living expenses, fund the negative cash flow of the rent houses, and fund the negative cash flow of the children's learning center.

And borrow he did. The evidence reflects that as of the date of filing the Debtor owed American Express approximately $18,796.27 (3 separate cards), MasterCard $4,647.30, Visa $25,643.69 (5 separate cards including $5,961.36 on First Select Visa Card), Discover $3,050.61 and Texaco $116.18.

The indebtedness at issue results from three cash advances obtained by the Debtor under the Gold First Select Visa card issued by Plaintiff. The first advance of $3,000.00 occurred on November 2, 1989; the second of $1,500.00 on December 5, 1989; and the third of $1,100.00 on December 19, 1989. During the time these advances were made, the Debtor did make the minimum monthly payment as called for pursuant to his agreement with the Plaintiff; however, he failed to notify the Plaintiff that he no longer had a job with an $80,000.00 salary but was self employed and therefore he was totally dependent upon profits of his recently purchased business, which had only negative cash flow, to live. Both of these notifications were required under the terms of the agreement pursuant to which the Gold First Select Visa card was issued.

### Analysis

At the conclusion of the hearing the Court found that the information contained on the credit card application was completely and totally accurate when submitted. The Debtor's base salary at Aero Scientific at that time was $80,000.00 per year; he had held that job for just under one year; and he had lived in his present home which he owned for approximately one year. Based thereon, the Court concluded that judgment in favor of the Debtor/Defendant was appropriate upon the cause of action pled by Plaintiff under 11 U.S.C. § 523(a)(2)(B).

The question remaining for the Court is whether the Debtor's unilateral use of the Visa card to obtain the cash advances outlined above constitute the obtaining of money by false pretense, false representation, or actual fraud under § 523(a)(2)(A) of the Code. In order to win, the Plaintiff must establish that the Debtor "(1) made a materially false representation, (2) with the intent to defraud, and (3) that the bank relied upon that false representation." *Matter of Ratajczak*, 5 B.R. 583, 586 (Bankr.N.D.Fla.1980).

On January 15, 1991, the United States Supreme Court rendered its decision in *Coy R. Grogan, et al v. Frank J. Garner, Jr.*, 498 U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) in which it unanimously concluded that "[t]he standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard" normally applicable in civil actions between private litigants. At ——, 111 S.Ct. at 661. Prior thereto a great many courts had previously invoked a clear and convincing standard. Further, courts had cited earlier United States Supreme Court decisions for the following proposition:

"It is equally axiomatic that the provisions of the Bankruptcy Code dealing with discharge are remedial and should be construed liberally in favor of debtors and against creditors who challenge the scope and extent of the protection granted by the general bankruptcy discharge. The entire bankruptcy scheme was designed in part to give debtors a fresh start in life, free and unencumbered from pressing debts so they could become useful members of society."

*Chevy Chase FSB v. Hable (In re Hable)*, 107 B.R. 356 (Bankr.N.D.Fla.1989) citing *Lines v. Frederick*, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970); *Local Loan v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934).

Contrasted with this older language from the Supreme Court we have the new language of the *Grogan v. Garner* case.

"We are unpersuaded by the argument that the clear-and-convincing standard is required to effectuate the 'fresh start' policy of the Bankruptcy Code. This Court has certainly acknowledged that a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' *Local Loan Co. v. Hunt,* 292 U.S. 234, 244 [54 S.Ct. 695, 699, 78 L.Ed. 1230] (1934). But in the same breath we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.' Ibid."

*Grogan v. Garner,* at ——, 111 S.Ct. at 659. The Supreme Court goes on to state that it was "unlikely that Congress, in fashioning the standard of proof that governs the applicability of these provisions, would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting the victims of fraud." Id. It is, therefore, clear from the *Grogan* opinion that the Supreme Court now thinks that a preponderance of evidence in § 523(a) matters "reflects a fair balance between these conflicting interests". Id.

Accordingly, this Court will use that standard and will refrain from liberally construing the § 523(a) provisions in favor of debtors and against creditors.

At the conclusion of the hearing the Court concluded that each time the Debtor used the Plaintiff's Visa card to obtain a cash advance, he was making an implied representation to the Plaintiff that he had both the present intention and ability to repay the indebtedness created thereby. *Norwest Card Services v. Barnacle (In re Barnacle),* 44 B.R. 50 (Bankr.D.Minn.1984); *Ranier Bank v. Poteet (In re Poteet),* 12 B.R. 565 (Bankr.N.D.Tex.1981).

■ The Court has reviewed the cases typically referred to as the "assumption of the risk" cases. See, *First National Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983); *In re Carpenter,* 53 B.R. 724, 728 (Bankr.N.D.Ga.1985). The Court agrees with the BAP for the Ninth Circuit as stated in *In re Dougherty* that the assumption of the risk theory "places credit card issuers in a virtually impossible position with respect to credit card charges made prior to revocation of the card". *Citibank South Dakota v. Dougherty (In re Dougherty),* 84 B.R. 653 (9th Cir. BAP 1988). For that reason it will not be followed or applied.

The Court, however, disagrees with the *Dougherty* court that the implied representation theory "places credit card issuers in a preferred position in proving nondischargeability vis-a-vis other creditors." Id. 653, 656. In fact, what the implied representation theory does is recognize the reality of the credit card system presently in place in America. In a credit card transaction the issuer of the credit is not able to have a face to face confrontation with the borrower each time the card is used. The terms and availability of credit have been agreed to on the front end. Here, the issuer has pre-approved specific dollar limits of credit pursuant to a written agreement based upon its analysis of the prospective cardholder's financial condition. "It is unrealistic to require an overt expression on the part of the purchaser to both the seller and to the bank that he is solvent and intends to pay for the purchase each time he uses the credit card." *In re Poteet* at 568. Therefore, each time the Debtor used the card to obtain the advances in question he was making an implied representation that he had the present intent and ability to repay them.

■ The issue remains as to whether such implied representation was made with the requisite fraudulent intent required under § 523(a)(2)(A). This is a fact-intensive inquiry and in large part depends upon this Court's assessment of the credibility of the testimony of the Debtor that at the time of the charges in question he did have a good

faith intent, as well as a good faith belief with regard to his ability, to repay the advances. Because, "[w]here hopeless insolvency at the time of the purchase makes payment impossible, fraudulent intent may be inferred." *Matter of Boydston*, 520 F.2d 1098, 1101 (5th Cir.1975).

The Court is convinced that at the time cash advances in question were obtained by the Debtor that he had an intention to repay the advances. However, that is not enough. The Court must also determine whether that intention can be viewed as one which was held in good faith in view of the Debtor's ability to repay at the time in question. A debtor cannot ignore the reality of his financial situation and still maintain that he has a "good faith intent" to repay.

As the Fifth Circuit has told us in the *Boydston* case, "If the debtor is hopelessly insolvent then fraudulent intent may be inferred." *Boydston* at 1101. In the case at bar, the facts are clear. At the time these charges were made, the Debtor was living off of credit. He had no source of income and three sources of financial drain—his business, the rent houses and daily living expenses. In order to maintain the negative cash flow, *and live*, it was necessary that he borrow. The Debtor maintained that up until March or April of 1990 he believed the business was "about to take off". In retrospect the Debtor acknowledged this was a vain hope. In fact, any reasonable person viewing the circumstances at the time the advances were made would have easily recognized the hopelessness of the Debtor's financial situation. Therefore, as the Debtor is a person with demonstrated managerial and business abilities, it simply does not ring true that he did not realize that the chances of his being able to repay this indebtedness was next to none. This is especially true in light of the large amount of other credit card indebtedness (a total of $52,254.05) being created by the Debtor at or about the same time. At the time of the advances the Debtor did not then have the ability to repay them. Therefore, the Court concludes from a preponderance of the evidence that the professed intention of this Debtor to repay these advances when they were made was not held by him in good faith at that time as he knew that he did not then have the ability to repay them.

■ The last remaining element is that of creditor reliance. "The creditor must reasonably rely on the Debtor's false information. Case law holds that reasonable reliance is to be found if the creditor's actual conduct followed its normal business practices and/or standards in the industry and if the creditor, upon the particular facts, acted with ordinary diligence." *In re Barnacle*, supra at 54 citing *In re Denenberg*, 37 B.R. 267, 271 (Bankr.Mass. 1983). This test has been met in this case. Plaintiff followed its normal business practices in granting the initial extension of credit to the Debtor and in allowing such credit to remain outstanding so long as the account was paid on a current basis and in accordance with their agreement. All of the advances which are the subject of this lawsuit were made while the credit was current. There was nothing which would have put the Plaintiff upon notice of anything being amiss. Absent that, on this record, the Plaintiff wins. This is especially true due to the payment record in this case where the initial $5,000.00 credit advance had been paid back within six months and the normal payments requested of Plaintiff in November and December of 1989 (when the advances at issue occurred) were timely made.

### Conclusion

Plaintiff has met its burden of proof with regard to the elements of 11 U.S.C. § 523(a)(2)(A). Accordingly, a separate nondischargeable judgment shall be entered contemporaneous with this Memorandum Opinion.

### JUDGMENT

The Court held a trial of the above adversary proceeding on March 4, 1991. Pursuant to certain Findings of Fact and Conclusions of Law made both on the record at the conclusion of the hearing and contained in this Court's Memorandum Opinion of

even date herewith pursuant to Bankruptcy Rule 7052, the Court has determined that Judgment for the Plaintiff should be entered under 11 U.S.C. § 523(a)(2)(A). It is accordingly

ORDERED that Judgment in favor of First Deposit Credit Services Corporation, Plaintiff, against James Thomas Preece, Defendant, be, and it is hereby, entered in the principal sum of $5,600.00 plus interest accrued on such sum at the contract rate in accordance with the terms of the contract to the date of this Judgment, plus interest provided for at law from this date forward and for its costs, for all of which let execution issue. It is further

ORDERED that no attorney's fees are allowed as the record contains no evidence with regard to the same; and it is further

ORDERED that this Judgment is declared to be nondischargeable by reason of the Debtor's pending bankruptcy proceeding pursuant to 11 U.S.C. § 523(a)(2)(A).