**In re Randa Gay McDANIEL, Debtor.**

**BANK ONE COLUMBUS, N.A., Plaintiff,**

**v.**

**Randa Gay McDANIEL, Defendant.**

Bankruptcy No. 296–20193–7.
Adversary No. 296–2027.

United States Bankruptcy Court,
N.D. Texas,
Amarillo Division.

Nov. 4, 1996.

J. Ward Holliday, Polk, Scheer, Prober & Holliday, L.L.P., Dallas, TX, for Bank.

Troy A. Blackwell, Boren & Waggoner, L.L.P., Amarillo, TX, for Debtor.

## MEMORANDUM OF OPINION ON DISCHARGEABILITY OF CREDIT CARD INDEBTEDNESS

JOHN C. AKARD, Bankruptcy Judge.

Bank One Columbus, N.A. (Bank) seeks to have its claim of $3,249.95 against Randa Gay McDaniel (Debtor) declared nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code.[1] Finding that the Bank engaged in commercial entrapment, the court denies the Bank's request and discharges the indebtedness.[2]

### FACTS

The Bank issued a credit card to the Debtor in May 1994. The Bank's witness testified

that normal practice is to secure a credit report and review the Debtor's income and expenses prior to issuing a card. The witness assumed that had been done in 1994, but offered no evidence in support of that assumption. The Debtor received a $3,000.00 credit limit. The Debtor used the card, but paid off the balance in May 1995. She made no further charges until January 1996.

In November 1995, the Bank unilaterally raised the Debtor's credit limit to $5,400.00. The Bank's witness assumed that another credit check was made at that time, but had no direct knowledge of the actions taken by the department which raised the credit limit and offered no proof of any credit investigation at that time.

The Debtor has been employed for a number of years at a medical supply company. Her annual income is slightly in excess of $20,000.00. Each year she supplements her income by part-time work during the harvest season, using most of that income to pay the ad valorem taxes on her house. She stated that she was in tight financial circumstances and struggling to pay her bills. She used advances on various credit cards (but not the one issued by the Bank) to pay her bills. She then used her monthly income to make payments on the credit cards.

Sometime after the November 1995 decision to raise the Debtor's credit limit, the Bank sent the Debtor the following:

**IMPORTANT NEWS Great news … a special low 7.9% fixed APR to save you money!**

We're pleased to offer a special **low 7.9% fixed APR** (Annual Percentage Rate) on your account now through your May 1996 billing period. This special low rate applies to your existing balance and to any new purchase and cash advances—including your attached Access Check.

1. The Bankruptcy Code is 11 U.S.C. § 101 *et seq.* References to section numbers are references to sections in the Bankruptcy Code.

2. This court has jurisdiction of this matter under 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a), and Miscellaneous Rule No. 33 of the Northern District of Texas contained in Order of Reference of Bankruptcy Cases and Proceedings *Nunc Pro Tunc* dated August 3, 1984. This is a core proceeding pursuant to 28 U.S.C. § 157(a) and (b)(1), (b)(2)(*I*).

Beginning June 1996, the outstanding balance on your account, and any new purchases and cash advances, will be assessed finance charge at a **new low rate of 9.75% + LIBOR,** currently that's 15.65%, as explained in the enclosed Notice of Change in Terms.

**... and a new higher credit line!**

Because you're one of our most valuable Bank One credit cardmembers, we're pleased to **increase your credit line to $5,400!**

Use your attached Access Check any way you want—to consolidate other credit card balances or to buy a holiday gift. Write one for any amount, up to your available credit line, especially where credit cards aren't accepted.

If you need more Access Checks, just complete the order blank on your payment coupon, or call the customer service center. Remember that your Access Checks will be posted to your account as cash advances, including a cash advance fee, and they are subject to the terms of your amended Bank One Credit Card Agreement.

(emphasis in original)

On January 6, 1996, the Debtor succumbed to this solicitation and used one of the checks for a $2,500.00 cash advance. She noted the 7.9% interest rate offered. She had an obligation for a heat pump installed in her house two years before which bore interest at 14%, so she used $1,400.00 of the advance to pay off that obligation. She used the balance to pay on various bills. During the latter part of January, she secured an additional $600.00 cash advance which she used to pay bills.[3]

In mid-January 1996, she consulted an attorney who was a family friend. He advised her that she might have to take bankruptcy. She tried to secure financial assistance from another family friend, but was unsuccessful. On January 31, 1996 she contacted the firm which ultimately filed a bankruptcy petition for her. However, she testified that she did not make the final decision to file bankruptcy until March 1996. She hoped to secure steady additional part-time employment in order to resolve her financial difficulties. She did not realize the magnitude of her financial problems until she talked to the attorneys at the end of January. Her petition for relief under Chapter 7 of the Bankruptcy Code was filed on March 19, 1996.

## DISCUSSION

■ The Bank's complaint is brought under § 523(a)(2)(A) which reads as follows:

**11 U.S.C. § 523. Exceptions to discharge.**

(a) A discharge under section 727, 1141, 1228(a) 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;....

### *Did the Bank Rely?*

■ This court adopts the conclusions of Bankruptcy Judge Robert E. Ginsberg[4] in *AT & T Universal Card v. Alvi (In re Alvi),* 191 B.R. 724 (Bankr.N.D.Illinois 1996) in which he states:

After considering the legal standards now applicable to the determination of the dischargeability of credit card debt, the Court now finds: 1) Creditors who bring section 523(a)(2)(A) actions in consumer bankruptcy cases must prove that they "justifiably relied" on representations of a debtor when they extended credit; 2) the use of a credit card, in itself, does not constitute a representation or statement which is capable of being true or false; 3) Creditors

---

**3.** The amount claimed by the Bank apparently includes interest accrued to the date of the bankruptcy petition.

**4.** Judge Ginsberg is a highly respected bankruptcy scholar who presently serves as Vice Chairman of the Bankruptcy Review Commission.

must prove that a debtor had the requisite scienter.

*Id.* at 726.

In order to prevail the Bank must establish by, a preponderance of the evidence, all of the requirements of § 523(a)(2)(A). *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). First, the Bank must show that it justifiably relied on the Debtor's false pretenses, false representation or actual fraud. *Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). In this case the Bank offered no evidence of reliance. The testimony showed that the Debtor paid off the credit card and did not use it for a number of months. The Bank raised the Debtor's credit limit and sent the Debtor a reduced rate inducement to use the higher credit limit. Such actions are representations by the Bank; not representations by the Debtor.

■ Passively extending credit hardly constitutes reliance on individual instances of card usage, nor can this Court conceive why such reliance, if it did exist, should always be justifiable. A creditor cannot sit back and do nothing and still meet the standard for actual and justifiable reliance when it had an opportunity to make an adequate examination or investigation.

*Alvi* at 731.

Having failed to establish any reliance whatsoever, the Bank's complaint must be denied.

### *Did the Debtor Make a Representation?*

■ The Creditors in this case presume that incurring a charge on a credit card is a representation. This Court does not agree that use of a credit card to incur debt necessarily involves a representation as a matter of fact or a matter of law. In fact, this Court believes the opposite is true. The use of a credit card to incur debt in a typical credit card transaction involves no representation, express or implied.

*Id.* This court agrees with this analysis.

■ The Bank asserts that "[w]here hopeless insolvency at the time of the purchases makes payment impossible, fraudulent intent may be inferred." *Sears, Roebuck & Co. v. Boydston (In re Boydston),* 520 F.2d 1098, 1101 (5th Cir.1975) (citations omitted). Although *Boydston* involved § 17a(2) of the Bankruptcy Act of 1898, this court agrees that fraudulent intent may be inferred if the surrounding circumstances make such an inference appropriate. However, such an inference is not appropriate in this case. The Debtor testified that she was in difficult financial circumstances and was scrambling to try to meet her obligations. This is not unusual for debtors in difficult financial circumstances. She credibly testified that she did not realize the extent of her financial difficulties until the last of January when she visited a bankruptcy attorney.[5] She did not use the full amount of credit offered.

The Bank cites *First Deposit Credit Servs. Corp. v. Preece (In re Preece),* 125 B.R. 474 (Bankr.W.D.Tex.1991) for the proposition that although the Debtor has a good faith intent to repay the advances, the court must look at the Debtor's financial circumstances to determine if such intention is held in good faith. Mr. Preece was a business executive who formerly held an $80,000.00 per year position. He had been laid off for more than a year and was operating an unprofitable business. He used credit card advances for living expenses and to cover business losses. Using the *Boydston* rule, the court found fraudulent intent. The circumstances of this case are quite different. The Debtor in this case maintained the same employment she had when the Bank issued the card in 1994. She demonstrated little ability to understand financial affairs. She maintained a very modest lifestyle and her financial problems crept up on her gradually.[6]

---

5. At the time the Debtor filed her bankruptcy petition, she owed approximately $35,000.00 to credit card companies.

6. A decision by this court's predecessor, *Ranier Bank v. Poteet (In re Poteet),* 12 B.R. 565 (Bankr. N.D.Tex.1981) is similarly distinguishable. In that case, the debtors in the month and one-half prior to filing bankruptcy made $6,000 in pur-

chases, raising their credit card debt to $8,000 which was well in excess of their $2,500 credit limit. In addition, they made many small purchases to avoid having the store call the issuing bank for authorization. These factors persuaded the court that fraudulent intent might be inferred.

"Creditors cannot establish fraud based on the implied representation of an intent to repay and ability to pay based on the mere use by the debtor of a credit card." *AT & T Universal Card Servs. v. Samani (In re Samani)*, 192 B.R. 877, 879 (Bankr. S.D.Tex.1996). "It has long been recognized, however, that fraud is rarely proven by direct evidence. Instead, courts ordinarily consider an objective totality of the circumstances test to consider the circumstances of the alleged fraud." *Id.* at 880 (citations omitted). In determining the totality of the circumstances, the *Samani* court suggested several factors. This court will list those factors and comment on their applicability to this case:

1. **The length of time between the loan and the bankruptcy.** In this case there was a relatively short time between the January 6, 1996 $2,500.00 cash advance and the March 19, 1996 filing of the bankruptcy case. This short time span raises questions concerning the Debtor's intent.

2. **Changes in the buying habits of the debtor.** There was no evidence of any change in the Debtor's buying habits.

3. **The debtor's financial sophistication.** The Debtor in this case displayed no financial sophistication. There was no evidence that she had any training in accounting, budgeting or money management.

4. **Debtor's employment status.** In this case, the Debtor's employment status did not change from the initial issuance of the card through the date of the hearing on this matter. This stability of employment indicates that the Debtor did not make the cash advances at a time when she knew she could not pay for them.

5. **Whether the debtor consulted an attorney regarding filing bankruptcy before the charges were made.** In this case, the $2,500.00 advance was made before anyone suggested bankruptcy to her. The $600.00 advance was made after an attorney/friend suggested that she consider bankruptcy, but at a time when she was pursuing other methods of financial relief.

6. **Whether the purchases were for luxuries or necessities.** The evidence showed that the monies were used for the necessities of the Debtor's life.

7. **Whether the debtor was hopelessly insolvent at the time of the charges.** At the time of the charges in this case, the Debtor was hopelessly insolvent, but she did not realize that fact and hoped to take care of her problems through additional employment.

Therefore, the totality of the circumstances test yields the conclusion that the cash advances made by the Debtor in this case were not made with an intent to defraud the creditor, nor were they made under false pretenses or by false representations.

## CONCLUSION—COMMERCIAL ENTRAPMENT

In this case, the Bank sent a financially strapped Debtor an enticement to consolidate bills and to purchase holiday gifts, bolstered by emphasis on a low interest rate and an increased credit limit. The Bank cannot now be heard to complain that the Debtor committed fraud by doing the very thing the Bank touted—getting cash advances to pay other bills. To allow the Bank to prevail in this situation would result in converting dischargeable debts into nondischargeable debts and would amount to this court condoning commercial entrapment.

"Mercantile Bank cannot now take advantage of its own procedures to obtain a per se determination of nondischargeability based upon an objective inability to repay. This is particularly true where the inability to pay existed at the time the credit card was issued and there was no misrepresentation or fraud in connection with issuance of the card." *Mercantile Bank v. Hiemer (In re Hiemer)*, 184 B.R. 345 (Bankr.D.Neb.1995). In this case the Debtor's inability to pay was no different at the time of the Bank's solicitation than it was at the time of the filing of the bankruptcy.

JUDGMENT ACCORDINGLY.[7]

7. This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to FED. R.BANKR.P. 7052. This Memorandum will be published.