In re Deborah Irene AKINS, Debtor.

Universal Card Services
Corp., Plaintiff,

v.

Deborah Irene Akins, Defendant.

Bankruptcy No. 98–11423–FM.
Adversary No. 98–1148-FM.

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

May 17, 1999.

William F. Turman, Austin, TX, for Defendant.

Charles Moster, Moster & Wynne, Austin, TX, for Plaintiff.

### SUPPLEMENTAL AND AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRANK R. MONROE, Bankruptcy Judge.

The Court held a trial of this proceeding on April 22, 1999 at 9:30 a.m. At the conclusion of the trial, the Court ruled for the Defendant. A hearing was set on the Defendant's Request for Attorneys Fees under 11 U.S.C. § 523(d). That matter was taken under advisement. In order that the trial on the merits and the request for attorneys fees by Defendant be fully addressed in writing, these Supplemental and Amended Findings of Fact and Conclusions of Law are being issued under B.R. 7052 to amend and supplant those which were recited orally upon the record at the termination of the trial on the merits and to address the request for attorneys fees.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). As this matter both arises under Title 11 and in a case under Title 11, this Court has the jurisdiction to enter a final judgment under 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a) and (b)(1), 28 U.S.C. § 151, and the Standing Order of Reference in the United States

District Court for the Western District of Texas.

## Findings of Fact

Defendant obtained a credit card from Plaintiff at the invitation of the Plaintiff. Such invitation was issued by the Plaintiff because of information Plaintiff obtained concerning Defendant's credit rating from the credit bureau it uses. Specifically, Plaintiff relied on Defendant's FICO score, which is a score that the credit agencies give to individuals which supposedly[1] reflects their creditworthiness. None of the information obtained and relied upon by Plaintiffs in issuing their solicitation to Defendant was either received or requested from the Defendant.

The card member application which Plaintiff sent Defendant was completed by her and returned to Plaintiff. This application stated that Defendant had been PRE–APPROVED for a $4,000.00 unsecured credit line. Although the form had a blank for the Defendant to fill in her annual income (which she did) no other financial information was requested. It is hard to see how Plaintiff relied on that information (even though it was accurate) since the credit line had been PRE–APPROVED. Upon receipt of the PRE–APPROVED application, Plaintiff then sent Defendant a credit card. The credit account was officially opened on October 18, 1993. No charges were ever made on the card until December 24, 1997.

The card member agreement which Plaintiff sent to Defendant with her new credit card contains *no* express warranties by the Defendant. For example, there is no warranty or representation that when she uses the credit line that she either has the ability or intent to repay the charges. The only statement of responsibility of payment is in paragraph 2 of the card member agreement wherein it states, "You are responsible for all amounts owed on your Account, whether it is used by you or by an Authorized User, and you agree to pay such amounts according to the terms of this agreement." Further, there is nothing in the card member agreement that would require the Defendant to advise Plaintiff of any change in her financial condition, job status, or gross income.

At the time the credit card was issued, the Debtor lived in Mississippi, was married and had a total gross annual income of approximately $32,000.00. A divorce caused a reduction of income for her because, as a member of the National Guard, upon becoming single, her living allowance was reduced by $800.00 per month. This was an especially large "hit" to Defendant as the living allowance is a non-taxable item.

Then, in February 1997, Defendant moved to Austin, Texas to help her mother with her ailing father. This resulted in a reduction of her rank from E–6 to E–5. The further reduced income and the increased expenses from living in the Austin, Texas area resulted in a hardship for Defendant.

Defendant had routinely used her credit cards with Bank One and First USA over the years. The record does not reflect the exact amount of debt under these two cards at either the time of her divorce or her relocation. But the Court concludes that they were close to being charged up to their limit at the time of Defendant's relocation to Austin because by the summer of 1997, Defendant had "maxed out" her credit limits with both these card issuers (each being $15,000.00). In fact, she became in payment default on them because she helped her mother pay her father's burial expenses instead of paying her monthly minimum for 2–3 months in late summer/early fall, 1997. In November, 1997, Defendant negotiated repayment agreements with both Bank One and First USA whereby she was to pay monthly 2% of the outstanding balances for three months to get those accounts re-instated.

---

1. As we shall see later, the system is flawed.

To pay these First USA and Bank One monthly payments, Defendant began working a second job at night.

In mid-November of 1997, the Defendant received an *unsolicited* check from Plaintiff with a proposal that she use it.[2] Plaintiff's representative testified that the check was sent to Defendant only after they checked with their credit agency and found Defendant's FICO score to be high enough to send it out. However, at that time, Defendant owed First USA and Bank One the maximum credit limit on their respective credit cards, or the total of approximately $30,000.00, or 150% of her annual gross income. However, neither of those entities had reported to the credit agency that the Defendant had maxed out her credit with them and was, in fact, in default. Therein lies the problem. The credit agency did not have an accurate picture of the Defendant's financial situation. And, Plaintiff did not check with Defendant prior to sending her the check to use in November, 1997. It only checked her FICO score with the credit agency. And, since Bank One and First USA had not reported the Debtor's current status with them, her FICO score looked good.

Upon receipt of the check and the written urging from Plaintiff to use it, Defendant did nothing. Later, on December 20, 1997, Defendant called Plaintiff and asked Plaintiff if it was alright for her to use the check because she had some bills that she was behind on and needed to pay. Instead of inquiring as to the amount of the bills and the total of her financial condition at that time, the representative of Plaintiff again checked only her FICO score with their credit reporting agency, found it sufficient, and told her to use it up to the full amount of her credit limit to pay her bills. And, so she did, writing a check for $4,000.00 and putting it in her bank account.

The $4,000.00 was used to pay Sears the amounts of $799.79 and $86.59, J.C. Penney the amount of $404.42, Haverty's the amount of $1,521.28, PrimeCo $150.00, Amoco $120.54, Citco $113.75, Texaco $357.75, Mobil $80.00, Target $104.24 and $46.46, and Sam's Club $86.00. So, Defendant used the check exactly as she had disclosed to Plaintiff and as she was authorized by Plaintiff, i.e., to pay off bills she was having trouble paying.

In January, 1998, Defendant was forced to quit her second job because the National Guard kept sending her out of town during the work week which made it impossible for her to keep it.

Then in February 1998, without the income from the second job, Defendant realized that she could not make the payments she had negotiated with First USA and Bank One. She sought counseling at a local consumer counseling agency and was told that she needed to file bankruptcy. She then met with her present counsel who advised her to file Chapter 7; and she did.

At the time the check was used, Defendant had a good faith belief that she would be able to pay the $4000.00 back to Plaintiff. She had a plan and a second job with which to make the payments to First USA and Bank One. She used the $4,000.00 from Plaintiff to consolidate several bills thereby reducing her overall monthly payments. She had absolutely no thought whatsoever of filing bankruptcy. Her good faith in dealing with Plaintiff is particularly shown by the fact that she checked with Plaintiff's representative before using the unsolicited check they had sent to her. Further, she relied on Plaintiff's representative who told her to use it to pay off her bills. Plaintiff's representative asked for no details but only checked her FICO score with the credit agency.

After the Debtor filed bankruptcy on April 24, 1998, the Section 341 creditors

2. This marketing ploy was apparently used to get Defendant to use Plaintiff's credit facility as she had never used it before.

meeting was set for May 21, 1998. This is the time when creditors who have questions concerning the dischargeability of their debt or concerning any of the Debtor's financial activities or schedules appear and ask questions to inform themselves as to whether or not there is any cause to be suspicious. No one from Plaintiff attended the Section 341 meeting. In fact, counsel for Plaintiff did not even receive the file from Plaintiff until June 10, 1998, almost three weeks after the Section 341 meeting. The deadline for filing the complaint in question was July 20, 1998, giving Plaintiff's counsel forty days, or almost six weeks, to ask of the Defendant anything they desired. They could have set a Rule 2004 examination [a legal fishing expedition] to ask any question whatsoever with regard to the account and the circumstances of her use of the unsolicited check she had received from Plaintiff. However, they did not do so. They could have phoned Debtor's attorney to discuss the issue, set discovery by agreement, or request an extension of time to file a dischargeability complaint. They did none of these.

One of the attorneys for the Plaintiff did, however, analyze Defendant's schedules and based upon such analysis (1) found her to be hopelessly insolvent, (2) found that the charge in question for the full amount of the credit limit was made within four months of bankruptcy, and (3) found that her monthly cash flow was insufficient to pay her monthly payments.[3] Without more, counsel determined that a potential cause of action existed. However, counsel did nothing further at that time. No attempt was made to contact the Defendant or her lawyer until July 14, 1996, when just six days before the last date to file a dischargeability complaint Plaintiff's counsel sent a letter to Defendant's counsel by regular mail threatening to commence a § 523(a) dischargeability action unless Defendant provided some

fourteen categories of information and/or explanations. The written communication was clearly a form letter and was not tailored in any respect to this particular Debtor or the fact situation alleged to be have been so completely investigated by counsel prior to the filing of this case. That letter was received by Debtor's counsel on July 16, 1998, and, on the following day, Friday, July 17, 1998, Debtor's counsel responded with a letter of indignation. The record is not clear whether the Plaintiff's attorneys received and read the Defendant's counsel's response letter prior to filing their complaint on the following Monday, July 20, 1998. But, even if they did, it is hard to imagine that the complaint was not already drafted and ready to go. And remember, Plaintiff at no time asked this Court or Defendant's attorney for an extension of the bar date within which to file the dischargeability action in order to obtain the Debtor's side of the story.

Effectively, the Plaintiff waited until the last possible moment to contact the Defendant, did so only by sending a form letter to her lawyer asking for an excessive amount of documentation and information via regular mail *just six days before the bar date,* filed a complaint on the bar date never having personally spoken with Defendant or her counsel, never asked Defendant's counsel for an extension of time to conduct an appropriate investigation, never requested a Rule 2004 examination, did not attended the Section 341 meeting, and only looked at the Debtor's schedules, the amount of the charge in question, and its proximity to the filing date in its pre-filing investigation.

It is important to note that had Plaintiff asked the Debtor about the circumstances surrounding the charges it would have learned [as revealed in trial] that the Defendant herself got permission from Plaintiff's representative to use the check that had been sent to her unsolicited by Plain-

---

3. Of course, items # 1 and # 3 exist in virtually every personal bankruptcy case. Other-

wise, the no one would have any reason to file bankruptcy.

tiff for the exact purpose for which she used it and that their representative made no request for any information concerning the Defendant's financial status at that time but simply told her that she could use the check for payment of the bills that she was having trouble paying.

### Issues

1. O reliance, O reliance, wherefor aren't thou, O reliance?
2. Behind what rock is substantial justification hiding?

### Conclusions of Law

■■■ 1. *11 U.S.C. § 523(a)(2)(A).* Plaintiff instituted this adversary proceeding seeking a determination that the debt of the Defendant to it is non-dischargeable under 11 U.S.C. § 523(a)(2)(A). This is commonly called the fraud exception to dischargeability. In order to win, the Plaintiff must establish that the Defendant "(1) made a materially false representation, (2) with the intent to defraud, and (3) the bank relied upon that false representation" and was damaged thereby. *Matter of Ratajczak,* 5 B.R. 583, 586 (Bankr. N.D.Fla.1980). Plaintiff must prove its case by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

The foregoing Findings of Fact would lead a reasonable person to believe that Plaintiff's case is not even strong enough to be called flimsy. In fact, it is non-existent. In an effort to shore up its position, Plaintiff fervently argues that their proof fits well within the controlling authority of *Matter of Boydston,* 520 F.2d

1098 (5th Cir.1975) and this Court's previous decision in *In re Preece,* 125 B.R. 474 (Bankr.W.D.Tex.1991). Nothing could be further from the truth.

■■ The *Boydston* opinion stands for authority that, "Where hopeless insolvency at the time of the purchases make payment impossible, fraudulent intent may be inferred."[4] The question here is, however, "What does that have to with the case at bar?" Here, Defendant called the Plaintiff prior to using the check which Plaintiff had sent her. She disclosed to Plaintiff's representative that she was having trouble making payments on her bills and wanted to know if it was okay to use the check to pay off some of them and thereby consolidate her payments. Plaintiff's representative answered, "Yes". Plaintiff's representative asked for no financial information whatsoever. Defendant made no false representation. What she said was true. And, there is absolutely no evidence of any intent to defraud. Further, Plaintiff's representative asked for no specifics. She simply looked up Defendant's FICO score on the computer *and relied on it.* When you rely on information supplied by a third party that you contract with to supply such information, how can the Debtor be held accountable if the information proves inaccurate? It is incredulous, to say the least, that Plaintiff now wants this debt to be held non-dischargeable as being incurred through "fraud". More appropriately, this case fits within Judge Akard's theory of "commercial entrapment". *In re McDaniel,* 202 B.R. 74, 79 (Bankr.N.D.Tex.1996).

---

**4.** However, the exact holding of *Boydston* was an affirmation of the lower court's decision that a prior decision of the Circuit in *Davison–Paxon Co. v. Caldwell,* 115 F.2d 189 (5th Cir.1940), cert. den., 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), "would mandate a discharge in this case *even if Boydston had no intention of paying for the merchandise.* In that case we held that purchasing goods on credit with no present intention of paying for them was not embraced by the Act's proscription against obtaining property by false pre-

tenses or representations. Debts created through credit purchases while concealing insolvency or inability to pay were found to be dischargeable." The Circuit then noted the criticism that the *Davison–Paxon* decision had received, but then did not reach the issue because they disposed of the case under the clearly erroneous rule and affirmed the lower court. Even so, *Boydston* does stand as authority for the proposition that fraudulent intent may be inferred where hopeless insolvency exists at the time of the credit transaction.

In *Preece,* the facts are markedly different than the case at bar. For example, in *Preece,* at the time the charges were made, the Debtor was living off credit. "He had no source of income and three sources of financial drain—his business, the rent houses and daily living expenses." *Preece, supra,* 125 B.R. at 478. Additionally, in *Preece* there was no telephone conference between the Debtor and the credit card issuer's representative prior to the cash advances being taken. Here, however, they were explicitly authorized by Plaintiff after Defendant disclosed the purpose for which the funds would be used. *Id.* at 477. Third, under the cardholder agreement in *Preece,* the Debtor was obligated to notify the credit card issuer of his change in employment, that is, that he no longer had an $80,000.00 per year salary but was self-employed. *Id.* at 476. No such provision exists in this card holder agreement. Fourth, in *Preece,* the debtor and a representative of the card issuer had a telephone conversation *before* the card was ever issued in which certain information was verified personally. Clearly reliance by the credit card issuer upon the information contained on the credit card application existed in *Preece.* And, the debtor was contractual bound to notify the card issuer of material changes. Not so here as everything was PRE–APPROVED based solely upon information that the Plaintiff got from its third party credit agency. The differences between this case and *Preece* are substantial and material. They demand a different result in this case.

This is not the case of the Debtor run amuck with credit cards or living off of credit. Here, the Debtor had recently become in default with her two largest credit cards, which were admittedly maxed out, because she used the money she had earmarked to pay the minimum monthly payments on those cards to help her mother with burial expenses for her father in late summer/early fall 1997. Upon notification of the default, she immediately worked out payment arrangements by which her accounts were placed in a non-default position. In order to make those payments, she got a second job at night. She only used the unsolicited check from the Plaintiff after calling them, disclosing to them what she was going to use the money for, and getting their okay.

■ The implied representation theory[5] used by this Court in *Preece* is basically a recognition by courts that "It is unrealistic to *require* an overt expression on the part of the purchaser to both the seller and the bank that he is solvent and intends to pay for the purchase each time he uses the credit card." *In re Poteet,* 12 B.R. 565, 568 (Bankr.N.D.Tex.1981)(emphasis added). Otherwise, there would be absolutely no protection for credit card issuers from the hopelessly insolvent *and unscrupulous* debtor. However, it should be noted that there is a significant contrary body of law which does not follow the implied representation rationale.

■ Here, however, the implied representation theory is not applicable. Why is that you may ask? Because there *was* an express representation. There *was* a face to face discussion, via telephone, between the Debtor and the Plaintiff's representative with regard to the Debtor's proposed use of the check that the Plaintiff had sent to her unsolicited. Where there is an express representation as to the proposed use of credit and consent is given to use the credit in such manner, it makes no sense to apply the theory of implied representation. Further, the Defendant made no false representation to the Plaintiff. She told them the truth. She used the

---

5. The implied representation theory is that in a credit card transaction, the debtor, when making a credit purchase or other use of the credit facility, makes an implied representation both as to his or her present intention and ability to repay the indebtedness being created. *Norwest Card Services v. Barnacle (In re Barnacle),* 44 B.R. 50 (Bankr.D.Minn. 1984); *Ranier Bank v. Poteet (In re Poteet),* 12 B.R. 565 (Bankr.N.D.Tex.1981); *In re Preece,* 125 B.R. 474 (Bankr.W.D.Tex.1991).

874

money just as she represented she would. And, she did intend to pay the money back.

It was the Plaintiff who dropped the ball. It relied solely on the FICO score that the credit reporting agency gave to them in exercising its "credit" judgment. Plaintiff's representative, although given a golden opportunity to verify financial creditworthiness, did nothing. She simply said "Use it". And, the information it got from the credit reporting agency was inaccurate because the credit reporting system is flawed in a major way. Had either First USA or Bank One reported in the fall of 1997 to the credit reporting agencies [that all of these credit card companies use] the existence of the fact that this Defendant had maxed out her $15,000.00 line of credit with each of them and that the Defendant was in payment default with each of them, Defendant's FICO score might not have been quite so good. And, Plaintiff might not have sent her a check. That is nothing, however, to hold against the Defendant.

It is the credit card companies that have created the system whereby they each submit information to the credit reporting agencies and then turn around and use a compilation thereof to determine a person's creditworthiness. The accuracy of the information they get back depends on the accuracy of the information they put in. And, until the credit card companies start reporting to the credit reporting agencies accurate, relevant, and *complete* information, such as the amount of the debt on each card on a monthly basis, the FICO scores will, in large part, continue to be *Alice in Wonderland* fiction. The credit card companies are living in a dream world. Why? Because they are making billions of dollars off the backs of the lower and middle income workers of this country. It is to their benefit that people max out their credit limits and pay interest, and interest, and interest, and interest, for the remainder of their lives. By paying only the minimum monthly payment, having

maxed out one's credit card, one may or may not be able to fully pay the debt within his or her lifetime depending on one's age. So having created the problem, the credit card companies somehow want the courts to determine they should never lose a penny, not even to the honest, but unfortunate, debtor. To grant Plaintiff relief in this case would be the epitome of a miscarriage of justice.

There is no reliance in this case. There is not even a scintilla of reliance in this case. There is no implied representation to be applied in this case. There was an express representation. And it was *true.* It was not false. Defendant made a factually accurate express representation to the Plaintiff prior to using the credit in question. She used the money as represented. And, she intended to pay the money back. There is no intent to defraud here, at least on the part of the Defendant.

The Plaintiff's extension of credit to the Defendant in this case was a result of their own negligent lending practices and the industry's negligent use of a faulty FICO score system which has been engineered to create the greatest amount of credit for the greatest number of working people in this country with artificially low monthly repayment requirements so that credit card companies can make the greatest amount of interest and profits possible. Losses such as this are simply a cost of doing business in such a greedy manner.

The Court will enter an Order of even date herewith determining this debt to be dischargeable.

■ 2. *Attorneys Fees.* Defendant is entitled to attorney's fees. Congress enacted § 523(b) of the Bankruptcy Code in an attempt to stop credit card issuers from abusing § 523(a)(2)(A). *In re Stahl,* 222 B.R. 497, 504 n.14 (Bankr.W.D.N.C.1998). Specifically, § 523(b) provides in relevant part that if the creditor loses a § 523(a)(2) action, as it has here, "the court *shall* grant judgment in favor of the debtor for the costs of and a reasonable attorneys' fee

for the proceeding if the court finds that the position of the creditor was *not* substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust." 11 U.S.C. § 523(b) (emphasis added).

Here, the creditor commenced an action under § 523(a)(2), the obligation concerns a consumer debt, and the obligation has been found to be dischargeable. The burden, therefore, shifts to the creditor to demonstrate "substantial justification" or "special circumstances". *Phillips v. Napier (In re Napier)*, 205 B.R. 900, 908 (Bankr.N.D.Ill.1997). In determining "substantial justification", the inquiry is whether the "plaintiff-creditor had a reasonable basis in both law and fact to seek a determination of non-dischargeability." *Stahl, supra*, 222 B.R. at 505, citing *FCC National Bank v. Dobbins*, 151 B.R. 509, 512 (W.D.Mo.1992). The *Stahl* case set out an analysis of individual factors which have been held sufficient by courts to find that the creditor's action was not substantially justified. They are:

(1) A creditor's reliance on the debtor's insolvency based solely upon the review of the debtor's schedules is not substantial justification. Citing *Dobbins, supra*, 151 B.R. 509.

(2) A pre-approved credit transaction defeats a claim of substantial justification. *In re Matter of Cordova*, 153 B.R. 352 (Bankr.N.D.Fla.1993).

(3) An automatic unilateral increase in the debtor's credit limit negates substantial justification. *In re Williamson, supra*, 181 B.R. 403 (Bankr.W.D.Mo. 1993). See also, *In re Ramirez*, 184 B.R. 859, 862 (Bankr.S.D.Fla.1995). Creditor's § 523 action "constitutes nothing more than persecuting an unfortunate honest debtor and blaming that debtor for AT & T's causal and inadequate lending practices."

(4) No discovery either by Rule 2004 or attending a § 341 meeting means no

substantial justification. *In re Grayson*, 199 B.R. 397 (Bankr.W.D.Mo.1996).

(5) Failure to plead fraud with sufficient particularity means no substantial justification. *In re Duplante*, 204 B.R. 49, 52 (Bankr.S.D.Cal.1996).

*All* of the foregoing factors exist in this case except there had been no increase of Defendant's credit limit.

Here, Plaintiff did not even send the file to their attorney until three weeks after the § 341 meeting. In the 40 remaining days after receipt of the file from their client, Plaintiff's counsel never once attempted to personally contact Debtor's counsel. They never asked for a Rule 2004 examination. They never talked to Debtor's counsel about informal discovery or an extension of the bar date within which to file a dischargeability complaint. They never asked the Court to extend the time so that they could conduct a proper discovery. All they did was look at the Defendant's schedules, determine that she was insolvent, that on a monthly basis she could not pay her bills and living expenses, and that the charge was made four months prior to bankruptcy. The Court would submit that in virtually every Chapter 7 case the individual debtor is insolvent and cannot pay both his bills and living expenses. Therefore, the only factor that Plaintiff could have relied upon in determining a cause of action existed was that the charge in question was for the full amount of the credit limit and it was made four months prior to filing bankruptcy. That's it. That's all.. There is nothing more that distinguishes this case from the normal case. And it is on this basis, and this basis alone, that the Plaintiff pulled the trigger. That is not a sufficient factual basis under the law to support the filing of a § 523(a)(2) compliant.

Plaintiff's counsel did send a three-page form letter by regular mail just six days before the bar date to Debtor's counsel. It asked for some 14 separate categories of information and/or documents. Clearly, a reasonable person could not expect to have

received a responsive reply to that request prior to the bar date. In fact, Debtor's counsel only received the letter four days before the bar date. He sent his rather acerbic reply the next day (a Friday which means it did not get to Plaintiff's counsel until the bar date). Any pretended reliance upon Debtor's counsel's negative reply to their form letter sent so late in the day is clearly feigned. It adds nothing to the issue of substantial justification. Had Plaintiff made a reasonable attempt to find out the facts before filing the case, it clearly would have seen that it had no case.

Plaintiff has failed to identify any special circumstances that would make the award of fees to the Debtor unjust as well.

The facts of this case fit nicely within the Court's conclusion in the *Ramirez* case where the Court found that the creditor's § 523 action "constitutes nothing more than persecuting an unfortunate honest debtor and blaming that debtor for AT & T's own casual and inadequate lending practices." *Ramirez, supra,* 184 B.R. at 862. And we have the same credit card issuer here. The Court has reviewed Defendant's counsel's fee request and finds it to be more than reasonable under the circumstances. It will be allowed and ordered paid.

Defendant asked for attorney's fees in the event Plaintiff filed an appeal but put on no evidence as to what would be reasonable. In the event Plaintiff does appeal, Defendant should request that the appellate court either award her attorney's fees for pursuing a frivolous appeal or remand that issue to this Court for further determination under § 523(d).

A Judgment of even date herewith in favor of Defendant against Plaintiff for her attorney's fees and costs will be entered.