In re Nina Morehead STAHL,
SSN 242–44–6370, Debtor.

**FIRST DEPOSIT NATIONAL
BANK, Plaintiff,**

v.

**Nina Morehead STAHL, Defendant.**

**Bankruptcy No. 96–40321.
Adversary No. 96–4418.**

United States Bankruptcy Court,
W.D. North Carolina,
Shelby Division.

July 1, 1998.

See also 222 B.R. 507.

Michael Hunter, Charlotte, NC, for Plaintiff.

P. Wayne Sigmon, Gastonia, NC, for Defendant.

## ORDER

MARVIN R. WOOTEN, Bankruptcy Judge.

THIS CAUSE coming on to be heard and being heard before the undersigned Judge of the United States Bankruptcy Court for the Western District of North Carolina, Shelby Division, in Charlotte, North Carolina in open court on May 19, 1998 upon the defendant's Motion for Summary Judgment and it appearing to the Court that there has been adequate Notice and a Hearing of this matter as that term in defined in the Bankruptcy Code and the Rules of Bankruptcy Procedure. Present at the hearing were Wayne Sigmon, attorney for the defendant, and Michael S. Hunter, attorney for the plaintiff. From the Briefs and Affidavits submitted and the arguments of counsel, the Court makes the following:

## FINDINGS OF FACT

1. Nina M. Stahl filed a voluntary Chapter 7 petition in this court on July 12, 1996. At the petition date, she was unemployed and had monthly income of $1,471.00 which consisted of $661.00 in Social Security benefits and $810.00 in VA benefits. For the years 1994, 1995 and up to July, 1996; Ms. Stahl averaged approximately $2,000.00 per year from employment and approximately $16,-500.00 per year from a combination of Social Security and VA benefits.

2. In her petition, Ms. Stahl listed total unsecured debts of $29,312.04. The plaintiff was listed as an unsecured creditor in the sum of $4,469.47.

3. Ms. Stahl was approved for a credit card account with the plaintiff on March 2, 1994. To obtain the credit card account, Ms. Stahl responded to the plaintiff's solicitation by filling out and returning a "Reply Card". Said card indicated in answer to two separate questions that Ms. Stahl was unemployed. In addition to the "Reply Card", the plaintiff obtained TWR and CBI credit reports concerning Ms. Stahl's credit.

4. Prior to October 6, 1995 Ms. Stahl made charges on the account and paid off the balance of the account. On October 6, 1995 Ms. Stahl received a cash advance by negotiating a $3,000.00 check sent to her by the plaintiff. She had not solicited the $3,000.00 check. The original credit limit on her account was $3,100.00. The plaintiff unilaterally increased the credit limit to $4,100.00 on the same date that the $3,000.00 cash advance was posted to her account. No credit reports concerning Ms. Stahl were obtained by the plaintiff after February 7, 1994 and

hence no credit report was obtained prior to increasing her credit limit. Ms. Stahl received another cash advance in the form of an unsolicited check of $1,000.00 on December 19, 1995 which caused her balance to exceed the credit limit by $19.57.

5. At the time Ms. Stahl received the cash advances, she intended to repay the Plaintiff. She thought that she would be able to pay as she had done in the past. She thought that after the Christmas season she was going to get a job at a printing company. The printing company had run advertisements in the newspaper for data entry and Ms. Stahl's neighbor who worked there tried to help her get a job. From talking with her neighbor, Ms. Stahl thought she would get a job at the printing company. However, she was not hired. She believes she was not hired because of her age. When she was not hired at the printing company, Ms. Stahl answered an advertisement from Cleveland Community College for older people looking for jobs. She took several tests and the community college sent out her resumes and referred her to prospective employers. Again, she was not hired. She applied for a telemarketing job and was not hired. She finally found a job sitting with elderly and sick people for $5.00 per hour four hours a day. Ms. Stahl used the money borrowed from the plaintiff to pay various bills. At the time she received the cash advances from the plaintiff, she had no idea that she would be filing for bankruptcy.

6. On December 5, 1995 Ms. Stahl made a $76.00 payment to the plaintiff's account; on January 12, 1996 she made a payment of $154.00; and on May 7, 1996 she made a $125.00 payment. In telephone conversations with representatives of the plaintiff, Ms. Stahl advised on February 6, 1996 that she "doesn't have any money, cannot borrow, no tax refund"; on February 13, 1996 she advised "no funds available—looking for work"; and on February 22, 1996 she advised "not working, social security is only income coming in, is overextended, had insurance and taxes to pay, not able to send anything, unable to borrow———".

7. Ms. Stahl first consulted her attorney about bankruptcy on April 25, 1996. She ultimately filed in July, 1996.

8. Subsequent to the filing of the petition, the plaintiff mailed to Ms. Stahl's attorney a letter entitled *"SETTLEMENT OFFER"* which had attached thereto a proposed Reaffirmation Agreement wherein Ms. Stahl would have had to pay the plaintiff's balance in full plus interest at 12% per annum. Upon advice of her attorney, Ms. Stahl chose not to reaffirm the debt.

9. In October, 1996 attorney Christine M. Lamb filed the Complaint initiating this Adversary Proceeding. The operative allegations of the Complaint are:

Paragraph 4: That the Debtor has possession of a First Deposit National Bank Visa credit card account and that on October 5, 1995 the balance was zero.

Paragraph 5: Between October 6, 1995 and December 19, 1995 the Debtor took two cash advances totalling $4,000.00.

Paragraph 6: Between July, 1995 and August, 1996 the Debtor opened three credit accounts (one a new car loan) and that by the petition date these loans had balances in excess of $10,000.00.

Paragraph 8: At the petition date the Debtor had no disposable income.

Paragraph 9: The Debtor incurred the $4,000.00 cash advances at a time when she was unable to meet her existing financial obligations.

Paragraph 10: When the Debtor received the $4,000.00 cash advances, she represented that she had the "ability and/or the intention to repay said debt, upon which representation the Plaintiff justifiably relied."

Paragraph 11: At the time the Debtor obtained the $4,000.00 in cash advances, however, the Debtor *intended to deceive the Plaintiff in that she either had no intention to repay said debt to the Plaintiff or the Debtor knew or should have known that she had no ability to repay said debt to the Plaintiff* (emphasis added).

Paragraph 12: Therefore, the Debtor obtained money from the Plaintiff by false pretenses, false representations, or actual

fraud and the debt is nondischargeable pursuant to 11 U.S.C. 523(a)(2)(A).

10. Attorney Robert Cooper of Rochester, New York referred the plaintiff's case to attorney Christine M. Lamb. Mr. Cooper has represented the plaintiff in prior adversary proceedings objecting the discharge of consumer debts pursuant to 11 U.S.C. § 523(a)(2)(A) in this Court.

11. On November 20, 1996, attorney Lamb mailed to Ms. Stahl's attorney a letter transmitting Plaintiff's First Set of Interrogatories, Plaintiff's First Document Requests, and Plaintiff's Request For Admissions which are collectively hereinafter referred to as "Plaintiff's Initial Discovery". In the prior adversary proceedings in this Court wherein Robert Cooper has represented the plaintiff, documents substantially in the form of Plaintiff's Initial Discovery have been sent by attorney Robert Cooper to the debtor(s)' attorney. In response to the Defendant's Requests for Admission that attorney Robert Cooper drafted the Plaintiff's Initial Discovery and the form Complaint used in this Adversary Proceeding, the plaintiff responded: "Robert S. Cooper assisted the attorney of record who received, reviewed, and executed, and served said document."

12. By letter to the attorney for Ms. Stahl dated December 3, 1996 attorney Lamb agreed to withdraw the Plaintiff's First Set of Interrogatories and Plaintiff's First Document Request. In response to Ms. Stahl's Request for Admission that requested the plaintiff to admit that in a telephone conversation on December 2, 1996 attorney Lamb remarked to the attorney for Ms. Stahl that the purpose of Plaintiff's Initial Discovery was to "try to determine if the plaintiff does have a lawsuit," the plaintiff responded:

> Objection to correspondence or communications between counsel for purposes of settlement of a discovery dispute being used in this litigation, however, without waiving this objection, the request is admitted, additionally, Plaintiff believes the statement has been taken out of context or misquoted. Plaintiff utilizes discovery requests for the purposes allowed and provided for and by the Federal Rules of Civil Procedure applicable to this Adversary Proceeding.

13. In response to Ms. Stahl's Interrogatory requesting the plaintiff to identify all steps taken to review and analyze Ms. Stahl's actions prior to the plaintiff deciding to file this Adversary Proceeding, the plaintiff responded:

> Objection, attorney-client privilege, and/or attorney work-product privilege, however, without waiving said objection, the Plaintiff reviewed the Debtor's account usage, the account history, the Debtor's amount of unsecured debt at the time the account was opened, the Debtor's unsecured debt at the time the Debtor filed bankruptcy, the Debtor's financial condition was set forth in the Debtor's sworn Petition and Schedules, sworn Statement of Financial Affairs, and related sworn statements filed with the Court. The attorney's office was contacted to inquire as to why the Debtor filed bankruptcy, what the cash advances taken from the Plaintiff's account were used for, and when the Debtor contacted her attorney regarding filing bankruptcy.

The attorney for Ms. Stahl did not answer plaintiff's questions concerning why Ms. Stahl filed bankruptcy or what the cash advances were used for.

14. Subsequent to December, 1996 Michael S. Hunter has been substituted as counsel for the plaintiff. On August 26, 1997 this Court, upon Motion of Ms. Stahl, entered an Order Compelling Discovery requiring the plaintiff to answer her discovery. Ms. Stahl has obtained two or three extensions of the discovery period in order to have her discovery answered.

15. The plaintiff did not appear and was not represented at Ms. Stahl's § 341 Meeting of Creditors. The plaintiff did not examine Ms. Stahl or cause Ms. Stahl to be examined prior to the filing of this Adversary Proceeding. Though this Adversary Proceeding has been pending for approximately 18 months, the plaintiff has not deposed or otherwise examined Ms. Stahl.

## DISCUSSION AND CONCLUSIONS OF LAW

### Standard for Summary Judgment

Summary judgment is appropriate under Rule 7056 of the Federal Rules of Bankruptcy Procedure and Rule 56 of the Federal Rules Civil Procedure when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The party is entitled to summary judgment when the evidence, viewed in the light most favorable to the party against whom summary judgment is sought, could not lead a rational factfinder to find for the non-moving party,[1] and the opposing party does not produce sufficient evidence to demonstrate a genuine, dispositive issue exists for trial.[2]

### I. Rule 12(b)(6) Motion

In the Answer filed by Ms. Stahl, she moved pursuant to Bankruptcy Rule 7012(b)(6), and Federal Rule of Civil Procedure 12(b)(6) to dismiss this Complaint for failure to state a claim upon which relief can be granted because the allegations of the complaint are not sufficiently specific to establish actual fraud; that the credit was obtained by false pretenses or false representations; and to establish the plaintiff's justifiable reliance. Rule 9(b) of the Federal Rules of Civil Procedure requires that all averments of fraud or mistake must state the circumstances constituting fraud or mistake with particularity. Rule 9(b) however, also provides that "intent, knowledge and other condition of mind of a person may be averred generally." In *In re Herring*[3] (which was decided on December 14, 1995 and, interestingly, in which Robert Cooper appeared as attorney for the plaintiff) Judge Thomas Small dismissed the plaintiff's complaint indicating that the allegations were not sufficiently specific regarding the debtor's actual fraud and regarding the claim that credit was obtained by false pretenses or false representation. Significantly, Judge Small commented:

> The real issue is whether a creditor must make a reasonable investigation concerning the facts that existed when the credit extensions were made, or whether the creditor may rely upon conclusory allegations based on the fact that credit was extended and a bankruptcy was filed. This issue is especially important at this time, when case filings are at an all time high and consumer credit has reached record levels.

Judge Small went on to comment that debtors are protected to some extent from frivolous actions by Rule 9011 of the Federal Rules of Bankruptcy Procedure and by Bankruptcy Code § 523(d). Apparently Judge Small saw in the complaint of Robert Cooper many of the same attributes which appear in this litigation. The complaint in this case appears to have been prepared for the plaintiff purely as a tactic to force the debtor to settle. By framing the complaint with only generalized representations of "fraudulent intent", the burden upon the debtor to prove the negative i.e., the lack of fraudulent intent, is substantial. Since the debtor does not have specific allegations to refute, she must build a case showing that she does not have the alleged intent. This Adversary Proceeding is nothing more than a tactic to force a settlement which, apparently, is a tactic that has been used by for the plaintiff not only in this court but in other courts including the Bankruptcy Court for the Eastern District of North Carolina.

### Section 523(a)(2)(A) Actual Fraud, False Pretenses and Misrepresentations

 Section 532(a)(2)(A) was designed by Congress to except from discharge those obligations arising from conduct that amounts to actual fraud under the common law. "Actual fraud, by definition, consists of any deceit, artifice, trick or design involving

**1.** *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**2.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Helm v.*

*Western Maryland Ry. Co.*, 838 F.2d 729 (4th Cir.1988).

**3.** 191 B.R. 317 (Bankr.E.D.N.C.1995).

direct and active operation of the mind, used to circumvent and cheat another —— something said, done or omitted with the design of perpetrating what is known to be a cheat or deception."[4] Paragraph (A) thus pertains to actual or positive fraud, not fraud that is implied by law.[5]

■ The elements of a cause of action under paragraph (A) are not specifically enumerated in the statute. Rather, the provision has been interpreted to incorporate the common law elements of proof. It is generally agreed that a creditor must establish all of the following elements in order to prevail under § 523(a)(2)(A):

(1) That the debtor made a representation;

(2) That the representation was false and the debtor knew the representation was false at the time it was made;

(3) That the representation was made with the intention and purpose of deceiving the creditor;

(4) That the creditor actually and justifiably relied upon the representation; and

(5) That the creditor sustained a loss or was damaged as a proximate result of the representation.[6]

The creditor has the burden of proving each of the foregoing elements by a preponderance of the evidence.[7]

■ A majority of courts considering the question have concluded that under some circumstances the use of a credit card can give rise to a nondischargeable debt under § 523(a)(2)(A). These cases find that by using the credit card the debtor impliedly represents that he or she has the intention of paying the charges for the goods or services purchased with the credit card.[8] The representation made by the credit card holder is not that he or she has the ability to repay the debt, but that he or she has the intention of repaying the debt.[9] If a credit card is used with no intention of attempting to pay the debt, there is a sufficient basis to deny discharge under § 523(a)(2)(A). "However, it is quite another matter where a person in financial distress incurs indebtedness before realizing that his or her financial condition is hopeless and that bankruptcy is dictated by the circumstances which exist at the time of such realization."[10]

■ The plaintiff asks the court to rule that if the bank throws raw meat to a hungry lion, the bank should expect him not to eat it because he is not able to pay for it. The bank expects this debtor to use the same kind of judgment that it or its lawyer might use. Hindsight is better than foresight and the evidence herein indicates no evidence at all of this woman's intent not to pay but substantial evidence of her intent to pay. I get numerous solicitations such at that in the case herein each week in my mail and I do not take advantage of them because I do not need the money. But, if I came home one day and had a wife in the hospital needing a hysterectomy and had no insurance and two kids in the hospital with broken legs and I was out of a job and there was a $3,000.00 check in the mail that I could use to pay the doctors, you better believe I would cash and spend it. These checks are sent unsolicited

**4.** *4 LAWRENCE P. KING, ET. AL., COLLIER ON BANKRUPTCY § 523.08[1][E] at 523–44 (15th ed. rev.1997).*

**5.** *See, Neal v. Clark,* 95 U.S. 704, 709, 24 L.Ed. 586 (1877). *See, also 124 Cong. Rec. 32,399 (1978) (statement of Rep. Edwards) Expressing Congress' desire to incorporate the actual fraud standard into § 523(a)(2)(A).*

**6.** *See, Fowler Bros v. Young, (In re Young),* 91 F.3d 1367, 1373 (10th Cir.1996).

**7.** *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Stanley,* 66 F.3d 664, 667 n. 4 (4th Cir.1995).

**8.** *See, In re Simos,* 209 B.R. 188 (Bkrtcy. M.D.N.C.1997) *citing In re Faulk,* 69 B.R. 743 (Bankr.N.D.Ind.1986); *In re Carrier,* 181 B.R. 742, 747 (Bankr.S.D.N.Y.1995); *and In re Anastas,* 94 F.3d 1280, 1285 (9th Cir.1996).

**9.** *In re Simos, supra.*

**10.** *In re Simos, supra, citing In re Anastas,* 94 F.3d 1280, 1283–84 (9th Cir.1996); *In re Alvi,* 191 B.R. 724, 733–34 (Bankr.N.D.Ill.1996); *In re Fulginiti,* 201 B.R. 730, 735 (Bankr.E.D.Pa. 1996).

and the debtors see the money and they need it and they spend it thinking they can pay it back. They are eternal optimists. The banks are also eternal optimists in sending them this money assuming that they will get paid in all cases. The debtors have the same optimism about paying as the banks have about receiving their money. The trouble is that they both just happen to be wrong in certain instances though neither had an intent to do anything wrong.

The remaining requirement for a showing of fraud in a credit card case is justifiable reliance on the representation of intent to pay and resulting loss to the creditor. The creditor must show that it justifiably relied upon the debtor's false pretenses, false representation or actual fraud.[11] In the instant case the plaintiff did not justifiably rely on any representation of Ms. Stahl when her original credit card application indicated that she was unemployed at the time the card was issued. Further, in instances such as here where the debtor paid off the credit card and did not use it for a number of months after which the bank increased the debtor's credit limit and gave the debtor an inducement to use the credit, courts have held that there is no justifiable reliance by the credit card company.[12]

"The bank raised the Debtor's credit limit and sent the Debtor a reduced rate inducement to use the higher credit limit. Such actions are representations by the Bank; not representations by the Debtor." [13]

### III. Section 523(d): Substantial Justification

Section 523(d) is the codification of a congressional attempt to protect consumer debtors from groundless nondischargeability actions under § 523(a)(2) which are brought with the hopes of extracting a settlement or reaffirmation of a particular obligation.[14] The drafters felt that such an abusive practice frustrates the Code's "fresh start" policy and accordingly provided for the imposition of costs and reasonable attorneys' fees for debtors.[15]

Section 523(d) provides:

If a creditor requests a determination of dischargeability of a *consumer debt* under subsection (a)(2) of this section, and such debt is discharged, the court *shall* grant judgment *in favor of the debtor* for the costs of and a reasonable attorneys' fee for the proceeding if the court finds that the position of the creditor was not *substantially justified*, except that the court shall not award such costs and fees if *special circumstances* would make the award unjust.[16]

Five elements must be established in order for a debtor to prevail in his or her request for costs and reasonable attorney's fees:

(1) The creditor must commence a non-dischargeability action under § 523(a)(2);

(2) The obligation must concern a consumer debt;

(3) The obligation must be found to be dischargeable;

(4) The bankruptcy court must find that the complaint was not substantially justified; and

(5) The bankruptcy court must be satisfied that there are no special or unique circumstances which would make the imposition of costs and attorneys' fees unjust.

Once the debtor has proven that the creditor requested a determination of nondischargeability of a consumer debt that has been discharged, the burden shifts to the creditor

---

**11.** *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)

**12.** *See, In re McDaniel,* 202 B.R. 74 (Bkrtcy. N.D.Tex.1996).

**13.** *In re McDaniel, supra.*

**14.** *Indeed, Congress believed that the mere threat of litigation over a § 523(a)(2) action and its attendant costs would frequently be sufficient to*

*induce the debtor to settle for a reduced sum, in order to avoid the costs of litigation. Thus, creditors with marginal cases are usually able to have at least part of its claim excepted from discharge (or reaffirmed), even though the merits of the case are weak."* H.R.Rep. No. 95–595 at 131 (1977), Reprinted in 1978 U.S.C.C.A.N. 5963, 6092.

**15.** *Id. at 130.*

**16.** *11 U.S.C. § 523(d) 1994 (emphasis added).*

to demonstrate that the action was "substantially justified" [17] or that the "special circumstances" exception is applicable.[18]

■ Under § 523(d) there is no requirement that the creditor-initiated lawsuit be frivolous or commenced in bad faith before costs and fees may be awarded.[19] "Substantially justified" has been interpreted to mean that the plaintiff-creditor had a reasonable basis in both law and fact to seek a determination of nondischargeability.[20] That basis becomes unreasonable if the plaintiff continues to pursue a proceeding after it knew or should have known that it could not prevail.[21] Thus, while the focus of the examination is frequently on the circumstances surrounding the decision to commence the case, the burden of establishing substantial justification is a "moving target". Therefore, an award will be proper in circumstances in which the creditor should reasonably discover that it is no longer justified despite the fact that the filing of the original complaint may have been justifiable.[22] The fact that no trial on the merits has occurred is not a barrier to a debtor's ability to recover costs and attorney's fees under § 523(d).[23]

■ A creditor's reliance on the debtor's insolvency, based upon review of bankruptcy schedules, without more, is not substantial justification.[24] Creditors have been found not substantially justified in claiming actual fraud where they solicited debtors with a pre-approved credit card.[25] No substantial justification was found when a creditor automatically increased the debtor's credit limit.[26] No substantial justification was found when the creditor conducted no discovery either by Rule 2004 examination or attendance at the § 341 Meeting of Creditors prior to filing the complaint.[27] No substantial justification was found when the creditor failed to consider controlling case law.[28] And, no substantial justification was found when the plaintiff failed to plead fraud with sufficient particularity.[29]

■ All of the elements for a finding of a lack of substantial justification under § 523(d) are present in the instant case. Other than reviewing Ms. Stahl's bankruptcy filings, the plaintiff made no real investigation to determine her intent. The plaintiff's own attorney admitted that the purpose of Plaintiff's Initial Discovery was to "try to determine if the plaintiff does have a lawsuit." It should have been apparent to the plaintiff from the very beginning that this action is meritless.

**17.** *A.L. Lee Mem'l Hosp. v. McFadyen (In re McFadyen)*, 192 B.R. 328, 333 (Bankr.N.D.N.Y. 1995); *Firstbanks v. Goss (In re Goss)* 149 B.R. 460, 462 (Bankr.E.D.Mich.1992); *Chrysler First Fin. Servs. Corp. v. Rhodes (In re Rhodes)*, 93 B.R. 622, 624 (Bankr.S.D.Ill.1988).

**18.** *Phillips v. Napier (In re Napier)*, 205 B.R. 900, 908 (Bankr.N.D.Ill.1997). *Although the denial of an award of costs and attorney's fees is authorized on the ground of "special circumstances," this exception must be construed with reference to traditional equitable principles and does not serve "as a license to the bankruptcy judge to base decision on idiosyncratic notions of equity, fair dealing, or ... family justice." In re Hingson*, 954 F.2d 428, 429–30 (7th Cir.1992).

**19.** *Boatmen Bank v. Holmes, (In re Holmes)*, 169 B.R. 186, 191 (Bankr.W.D.Mo.1994).

**20.** *FCC National Bank v. Dobbins*, 151 B.R. 509, 512 (W.D.Mo.1992)

**21.** *Mercantile Bank v. Williamson (In re Williamson)*, 181 B.R. 403, 409 (Bankr.W.D.Mo.1995)

**22.** *Manufacturers Hanover Trust Co. v. Hudgins*, 72 B.R. 214, 221 (N.D.Ill.1987).

**23.** *Key Bank of New York v. Schalk, (In re Schalk)*, 191 B.R. 522, 528 (Bankr.N.D.N.Y. 1995).

**24.** *Dobbins, supra*, 151 B.R. at 509.

**25.** *Matter of Cordova*, 153 B.R. 352 (Bankr. M.D.Fla.1993).

**26.** *In re Williamson, supra*, 181 B.R. at 403. *See also, In re Ramirez*, 184 B.R. 859, 862 (Bankr. S.D.Fla.1995) *Creditor's § 523 action "constitutes nothing more than persecuting an unfortunate honest debtor and blaming that debtor for AT & T's own casual and inadequate lending practices."*

**27.** *In re Grayson*, 199 B.R. 397 (Bankr.W.D.Mo. 1996).

**28.** *Leonard, supra*, 158 B.R. at 839.

**29.** *Duplante, supra*, 204 B.R. at 52.

## IV. The Tactical Consumer Dischargeability Complaint

Congress enacted § 523(d) to prevent creditor abuse in dischargeability matters which, obviously, is an area ripe for creditor abuse. As one court observed:

> Debtors are often represented by counsel who take their case on a flat-fee basis, and, therefore, have no financial incentive to litigate dischargeability complaints. Such counsel generally carry out their ethical responsibility to vigorously represent the interest of their clients. But, too often in cases where a creditor alleges fraudulent use of a credit card, debtors, with the advice or urging of counsel, agree to judgments which saddle them with obligations they are unable to pay. As a result, these same debtors forego protection provided them by the Bankruptcy Code.[30]

Against the backdrop of the bankruptcy bar's nationwide flat fee practice for debtor representation, the plaintiff and attorney Robert Cooper devised the documents filed for the plaintiff in this and other adversary proceedings solely for the purpose of extracting a settlement and Reaffirmation Agreement from the debtor. The Complaint, the letter entitled "*SETTLEMENT OFFER,*" the proposed Reaffirmation Agreement, the November 20, 1996 letter, and Plaintiff's Initial Discovery, when taken together, clearly show an intention to send a signal to the debtor's attorney that defense of the plaintiff's allegations of nondischargeability would be extensive and costly. Obviously, most Chapter 7 debtors cannot afford to pay for such a defense. Hence the plaintiff and Mr. Cooper have created just the dilemma they expected for the debtor's attorney—either settle or lose his shirt defending a costly case for which he may not be paid. This is why § 523(d) was enacted. In *In re Williamson*[31] the court stated "the only way to prevent creditors from obtaining leverage over the debtor by first filing a suit and considering the merits later, is to require the creditor to pay the costs, including reasonable attorneys fees, incurred by a debtor who must defend a frivolous suit." It is obvious that the attorney for the debtor in this case has spent a considerable amount of time and effort in defending this adversary proceeding. In his brief he indicated that as of the date of the brief based upon billing at his usual hourly rates, the fees and expenses in this matter totalled $14,629.02.

The attorney for the debtor has also requested a fee enhancement. In *In re Arroyo*[32] the Court, in a situation similar to the case at hand, granted the debtor's attorney a $5,000.00 fee enhancement.

Commenting on the Tactical Consumer Dischargeability Complaint, one court observed:

> AT & T's case is analogous to a gunslinger in the wild west without ammunition. It does not survive. This Court is not closing the 523(a)(2)(A) "town gates" to credit card issuers. Just don't ride into town firing blanks and kicking up dust in the hope of rustling up a settlement. Come in armed with facts to prove fraud or you may be driven out of town with a 523(d) bullet in your tail.[33]

Congress had the plaintiff in mind when § 523(d) was enacted. The tactics employed herein seeking to force the debtor to enter into a Reaffirmation Agreement or settlement are totally unreasonable. The defendant should be awarded all of her reasonable attorney's fees and recovery of costs.

There are ample facts presented to keep this issue from going to the jury and deciding same on Summary Judgment. The debt in question is dischargeable and the Complaint of the plaintiff was not substantially justified.

IT IS THEREFORE ORDERED as follows:

*Court, Southern District of Florida, decided January 30, 1997.*

---

**30.** *In re Grayson, supra,* 199 B.R. 397.

**31.** 181 B.R. 403, 409 (Bankr.W.D.Mo.1995).

**32.** *Case Number 96–12873–BKC–AJC, Adversary No. 96–0795–BKC–AJC, United States Bankruptcy*

**33.** *In re Chinchilla,* 202 B.R. 1010 (Bankr. S.D.Fla.1996).

1. That the debt of Ms. Stahl to the plaintiff be, and the same hereby is, deemed to be discharged; and

2. That Ms. Stahl have and recover her reasonable attorney's fees and costs incurred herein; and

3. That the attorney for Ms. Stahl prepare and file in this Court an Application for Attorney's Fees setting forth all the fees and costs involved herein which matter shall be heard in this Court on June 2, 1998 at 9:30 o'clock. a.m. at which time the Court will also consider the question of a fee enhancement; and

4. After the hearing on attorney's fees, Judgment shall be entered as set forth herein including setting appropriate attorney's fees and reimbursement of costs.

