**In re Patrick W. REID and Roselyn J. Reid, Debtors.**

**F.C.C. National Bank, Plaintiff,**

v.

**Roselyn J. Reid, Defendant.**

**Bankruptcy No. 98–12103 K.
Adversary No. 98–1194 K.**

United States Bankruptcy Court,
W.D. New York.

Aug. 5, 1999.

Robert S. Cooper, Rochester, NY, for plaintiff.

Brendan C. Hand, Buffalo, NY, for defendant.

## DECISION AFTER TRIAL

### MICHAEL J. KAPLAN, Chief Judge.

This 11 U.S.C. § 523(a)(2)(A) action was tried to the Bench on June 29, 1999. The following decision includes the Court's Findings and Conclusions under Rule 52, F.R.Civ.P.

## INTRODUCTION

The Court today finds that unless a "pre-approved" credit card commands a different result (as described in footnote 1), turning one's credit card and line of credit and PIN over to another (even to one's own spouse) to be freely used at the other's discretion and judgment without limitation, and handing over to the other person "convenience checks" endorsed in blank, all in utter disregard of the amount of debt incurred, constitutes a "false pretense" for purposes of 11 U.S.C. § 523(a)(2)(A). That false pretense lies in creating the false understanding that it is the judgment and discretion of the account holder that is being exercised, when in fact it is the judgment and discretion of one is not suable by the credit issuer, that is being exercised.

Necessarily included in this holding is a reiteration of this writer's holdings that § 523(a)(2)(A) does not require that the five-prong common law test of fraud and deceit be satisfied. This decision more fully explains why, in this writer's view,

holdings to the contrary are without statutory foundation.

Not all scams, stings, or shell games involve the actual malice that would be actionable under 11 U.S.C. § 523(a)(6), or the false representations that some courts believe to be a *sine qua non* of a § 523(a)(2)(A) action. The present case illustrates well this fact.

Additionally, the Court reaffirms and expands upon its holding in *Irr Supply Centers, Inc. v. Phipps (In re Phipps)*, 217 B.R. 427, 429–32 (Bankr.W.D.N.Y.1998), aff'd. on other grounds No. 98–CV–0294 C (W.D.N.Y. July 16, 1999), and rules itself bound by the decision of one District Judge, in an earlier case, commanding an award of attorneys fees to the prevailing creditor.

## FINDINGS OF FACT

1. In this joint Chapter 7 case, it is only the wife who is obligated on the debt that is the subject of this Adversary Proceeding.

2. This credit card/line of credit account had been open for a number of years prior to the bankruptcy, had been used several times before and paid off several times before the dates at issue here.

3. There is no evidence that this account was issued while the defendant was insolvent for purposes of the application of *In re Sigrist*.[1]

4. The defendant is a high school graduate and has worked either part-time or

---

1. In *In re Sigrist*, 163 B.R. 940 (Bankr. W.D.N.Y.1994), and *In re Burns*, 196 B.R. 11 (Bankr.W.D.N.Y.1996), this Court ruled that in carrying its burden of proof, a consumer credit issuer is not entitled to be assisted by an evidentiary inference of fraud from the use of the card in the debtor's usual ways while insolvent, if the credit was "pre-approved" while the debtor was already insolvent. In other words, if an issuer grants credit to an insolvent without asking the debtor about ability to repay, then the issuer may not claim the evidentiary benefit of an inference of fraud if the debtor continues her normal pattern of use. Such an issuer clearly did not care about the debtor's own stated basis for an ability to repay at the time the card was issued and therefore cannot later claim an inference to the contrary. The issuer must bring forth extrinsic evidence of fraud, such as acts in contemplation of bankruptcy. Although the credit issued in the case at Bar may or may not have been pre-approved, the defendant has offered no evidence that she was already insolvent when the account was opened or when the limits were increased (if they were).

full time as a teacher's aid for fourteen years.

5. She and her husband have been married for 21 years.

6. Her husband has been employed by the same employer for 22 years.

7. The defendant testified that she was raised in a household in which her father took care of all the bills and that her own household has been one in which her husband takes care of all the bills. Her mother never worried about them, and in her own marriage she has never worried about them.

8. She testified that though she used the account in question and other credit accounts, she believed that any single expenditure in excess of $300 would be "going overboard," at least as to the account with this plaintiff. (Cf. finding # 21 et seq.)

9. She claims never to have used an ATM machine (or even know her PIN number).

10. She and her husband had a number of credit card accounts. Some were hers, some his, and some joint. They kept the cards in the bedroom, and the two persons used them interchangeably.

11. She provided her husband with her PIN number so that he could freely use her card for cash advances.[2]

12. For several months commencing in December, 1996, the husband (a truck driver) had a temporary disability occasioned by a newly-emerged phobia regarding winter driving.

13. He returned to work with the same employer, but at a different job, at approximately the same rate of base pay, but with less overtime opportunity.

14. Overlapping the period of the husband's temporary disability, the defendant was laid off for a number of months. The record is not clear as to the dates of the lay-off. They were both back to work before the events described below. Neither the period of disability nor the lay-off were argued as a defense for the subsequent events described below.

15. Prior to 1997, the defendant and her husband did not generally maintain large balances on their credit cards, but the husband testified that apart from mortgage debts and car loans, they might have owed as much as $20,000 to $25,000 at some point prior to August, 1997.

16. Between September 30, 1997 and January 29, 1998, the account issued by the plaintiff in this case was the subject of nine cash advances totaling $8,442.08 and credit card purchases of $381.84. Prior to September 30, 1997, the account balance was *de minimus*.

17. Many of the debtors' other eight credit accounts were subject to similar "run-up" during the same period of time.

18. The defendant's husband testified that the couple's late–1997 purchases "were significantly different" than at any other time in their marriage. However, there is nothing in the record to suggest why this extraordinary usage began in late 1997, rather than earlier in 1997 or in late 1996 when, the husband claims, he developed a gambling addiction.[3]

19. Although some of the cash advances taken on the subject account were taken by the husband at ATMs, the vast bulk of the debt owed to the plaintiff and to other credit issuers in this case were in large cash advance "convenience checks."

2. The Debtor claims that she did not give her husband the PIN number to her account but permitted her husband unfettered access to all mail sent from the plaintiff, and that that is how he got the PIN. In this Court's view, that is the same as giving away her PIN number.

3. The husband testified that the couple had "a couple thousand" dollars in the bank when he began his alleged gambling stint. However, there was no suggestion that the "run up" began only when the cash ran out. The cash would have run out early in 1997, at the latest.

As to this plaintiff, the major advance was a cash advance check of $6,500 on November 19, 1997.

20. Debtor testified that she signed this and other cash advance checks whenever her husband requested it, and that he would make these requests when he indicated that he was "short" of funds to pay bills. She claims that none of the numerous "convenience checks" she signed ever had a face amount on it, whether preprinted by the lender or inscribed by the husband; she always signed them "in blank."

21. Despite finding # 8 (that any single purchase over $300 would be "going overboard," in the defendant's view), there were many substantial purchases on other cards during late 1997. For example, on a Sunoco MasterCard maintained in the defendant's own name, she remembers making a purchase of nearly $4,000 for furniture, and also several thousand dollars in purchases related to a daughter's wedding. (Some very small portions of the latter ($100 here or there) she claimed were to have been reimbursed by her daughter, but not all were so reimbursed.)

22. In August of 1997, $5,000 in convenience checks were drawn on another account and a $1,457 charge was incurred on that account for a new television set. In October of 1997, nearly $3,000 in unexplained charges were incurred and in August, 1997 a $4,500 convenience check was cashed on an account held only by the defendant's husband. On another account in the name of the defendant alone, the defendant signed two convenience checks in July of 1997, totaling $5,450, and in September of 1997 she signed another convenience check in the amount of $1,550. From August 26, 1997 to the end of October, 1997, over $6,200 in charges were incurred on a different account that was maintained in the husband's name only, many of which charges appear to be ATM withdrawals in Niagara Falls, Ontario, Canada. (Although the husband testified that some convenience check withdrawals may have involved consolidation or other payments on other obligations, there were no affirmative defenses raised, or documentary evidence introduced, to that effect.)

23. The defendant testified that she was aware that her husband had a drinking problem; that he would sometimes be away for one or two days at a time, supposedly drinking; that he would occasionally call her when he was "out drinking" to ask her to call his employer and tell his employer that he was ill and unable to report for work; and that on more than one occasion her husband would arise at three in the morning, get dressed and supposedly go "out drinking" with friends.

24. Nonetheless, the defendant states that she never looked at any bills, never asked her husband what their financial circumstances were, and never worried about whether they might be in over their heads. Never. Absolutely never. Not a single time.

25. The defendant's husband's testimony is that he developed addictive gambling in late 1996; that he hid this from his wife throughout all of 1997; that as to all of his disappearances during 1997 when he told his wife he was "out drinking," he was really at a casino in Niagara Falls, Ontario, Canada (less than 20 miles from Buffalo); and that the vast bulk of the cash obtained through the use of convenience checks during late 1997 were used for gambling. For example, if $4,500 were taken in cash, $3,000 would likely go to gambling and only $1,500 to bills, by his testimony.

26. There is no testimony that the husband received any counseling for his supposed gambling addiction, nor any testimony that he has ceased gambling. Rather, there was testimony that he obtained counseling for his phobia and drinking problem and that the defendant attended some counseling sessions with him. There is no evidence whatsoever of any gambling "problem" other than the husband's self-

serving testimony. (See, however, finding #22 which involved the only documentary evidence demonstrating a Canadian connection, and a consequent proximity to the casino in Niagara Falls, Ontario.) [4]

27. The defendant claims that she never knew about her husband's gambling addiction until he told her, in early 1998, that he had been to see an attorney and was counseled that they should file for bankruptcy.

28. Though she had accompanied her husband to the casino on at least two occasions, she claims to have been completely unaware that he was an addicted gambler because, by her testimony, they went their own way and met up later. She had no idea what he lost or won.

29. Throughout this litigation, the defendant and her husband have attested that his gambling losses were as much as $25,000.

30. By the time the couple filed their Chapter 7 petition, there was over $38,000 in debt on her accounts or her and her husband's joint accounts alone (which is to say, not counting accounts in her husband's name only). The nine cards (hers, his, and theirs) totaled $71,000.

31. At the time of the filing, the husband's gross income was $30,000 a year and the defendant's was about $12,000 gross, and if this was unusually low for them, it was not substantially so. They have five grown children and thirteen grandchildren. They live in a two-family home owned by the mother of one of the debtors, and supposedly make monthly rent payments to her. They also own a piece of rental property in which one of their own children resides, who paid them rent of $500 per month. That property has a value of only $28,000, but is mortgaged for $32,000. Some of the charges that were incurred on the several credit cards were for repairs and improvements to the rental property.

32. The defendant insists that she was never aware of a gambling problem prior to her husband's having seen an attorney; that the two had never spoken about their finances before he went to an attorney; that she never looked at their checkbook which she knew that her husband had diligently maintained and that was always readily available for her to see; that she never opened a piece of mail from a credit card company that was addressed to her or to anyone else at their address; that she never thought about how they could pay their bills; that she always thought they were "current" or "nearly current" on all their accounts even right up to the date of filing of the Chapter 7 petition.

33. Defendant and her husband signed their Chapter 7 petition on March 24, 1998, having met with bankruptcy counsel in early February of 1998.

34. Of $71,000 in credit card debt scheduled by the debtors in their filing, approximately $50,000 of it had been incurred in the last six months before the defendant's husband alone consulted with bankruptcy counsel.

4. It is axiomatic that judicial "factfinders" do not find facts. Rather, they conclude what it is more probable than not, in light of the evidence, including the demeanor of the witnesses. This writer makes no finding as to whether the husband's testimony is credible. If, in fact, tens of thousands of dollars are sitting in a hidden account or hidden assets somewhere else, then he (and perhaps the defendant as well) will have made out like the proverbial bandits if this account is held nondischargeable and if the perjury goes unproven until the expiration of the statute of limitations. Such is the current state of fact-finding when faced with an undocumented gambling defense. Gambling losses do not leave an audit trail if the gambler does not want them to. Thus, a false gambling defense can be a haven for the criminal mind who seeks a "cover" for hidden assets. For purposes of this decision, I accept the testimony of the defendant and her husband at face value, though much of it does not pass the "smell test."

## INSISTENCE UPON THE FIVE– PRONG TEST IS WITHOUT STATUTORY BASIS[5]

With one exception, I can contribute nothing to Bankruptcy Judge David Snow's excellent rationale for concluding that (1) actual fraud is not limited to the classic misrepresentation/reliance test, and that (2) "false pretenses," "false representations," and "actual fraud" are "separate categories rather than different descriptions of the same category." See Hon. David F. Snow, The Dischargeability of Credit Card Debt: New Developments and the Need for a New Direction, 72 Am.Bankr.L.J. 63, 95 (1998). The exception is that whereas Judge Snow expressly puzzled over the question of why the word "fraud" was reinserted in § 523(a)(2)(A) "nearly eighty years after its 1903 deletion from § 17a(2)," I believe I can provide the answer. *Id.* at 96.[6]

It is respectfully submitted that the answer lies in the Report of the 1970 Commission on the Bankruptcy Laws of the United States (the "Commission Report"). See H.R.Doc. No. 93–137, 93rd Cong., 1st Sess., Pts. I and II, 1973, *in* Collier on Bankruptcy, App. Vol. B, Pt. 4–219–871 (15th Ed.1998). The Commission proposed a new § 4–506(a) as follows:

(a) *Exceptions from Discharge.* A discharge extinguishes all debts of an individual, whether or not allowable, except the following:

(1) any liability for taxes with respect to which (A) a priority is granted under section 4–405(a)(5), (B) a return, if required to be filed, was not filed more than one year prior to the date of the petition, or (C) the debtor made a false or fraudulent return or willfully attempted in any manner to evade or defeat;

(2) *any debt, other than a consumer debt, for obtaining money, property, or services, or an extension or renewal of credit by (A) fraud or false pretenses or false representations or (B) use of a materially false statement in writing respecting his financial condition relied on by the creditor and made or published in any manner whatsoever with intend to deceive;*

(3) any debt for obtaining money, property, or services within 90 days before the date of the petition without the intention, at the time it was incurred, to pay the debt and in contemplation of the filing of a petition under this Act by or against him;

(4) any debt not scheduled in time for allowance, with the name of the creditor, if known to the debtor, unless the creditor had notice or actual knowledge of the case under the Act permitting timely filing for allowance;

(5) any liability of embezzlement or larceny;

(6) any liability to a spouse or child for maintenance or support, for alimony due or to become due, or under a property settlement in connection with a separation agreement or divorce decree;

(7) any liability for willful and malicious injury to the person or property of another;

(8) any educational debt if the first payment of any installment thereof was due on a date less than five years prior to the date of the petition and if its payment from future income or other wealth will not impose an undue hardship on the debtor and his dependents;

(9) any liability to the extent it is for a fine for the benefit of a federal, state, or local government; and

(10) any debt which was scheduled, or could have been scheduled, in a prior case in which the debtor waived dis-

---

**5.** Some courts perceive a basis in *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). That case (1) did not involve a credit card, but rather a letter, and thus "fit" the five-prong analysis, and (2) did not present any argument to the effect that the five-prong test is or is not the only test applicable under 11 U.S.C. § 523(a)(2)(A).

**6.** Note also that the Seventh Circuit puzzled over the same question. See *Mayer v. Spanel Int'l Ltd.,* 51 F.3d 670, 674 (7th Cir.1995).

charge or was denied discharge under any clause of section 4–505(a) of this Act except clause (7) or under section 14c of the former Act except clause (5) or (8). A debt not dischargeable under clause (4) or (8) of this subdivision may nevertheless be discharged in a subsequent case.

Collier on Bankruptcy, App. Vol. B, Pt. 4–706–07.

This proposal was in replacement of former § 17a which provided, in pertinent part:

*And provided further,* That a discharge in bankruptcy shall not release or affect any tax lien; (2) are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive, or for willful and malicious conversion of the property of another; (3) have not been duly scheduled in time for proof and allowance, with the name of the creditor, if known to the bankrupt, unless such creditor had notice or actual knowledge of the proceedings in bankruptcy; (4) were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity; (5) are for wages and commissions to the extent they are entitled to priority under subdivision a of section 64 of this Act; (6) are due for moneys of an employee received or retained by his employer to secure the faithful performance by such employee of the terms of a contract of employment; (7) are for alimony due or to become due, or for maintenance or support of wife or child, or for seduction of an unmarried female or for breach of promise of marriage accompanied by seduction, or for criminal conversation; or (8) are liabilities for willful and malicious

injuries to the person or property of another other than conversion as excepted under clause (2) of this subdivision. 17a of the Bankruptcy Act of 1898 as codified in former 11 U.S.C. § 35(a), as amended by Publ.L. 91–467, § 6 (1970).

A close comparison of the actual and proposed provisions, coupled with the Commission Report's text makes it clear that the Commission was proposing a major change in the law of exception to discharge, and the reinsertion of the word "fraud" was essential to that change. However, Congress rejected the change, and then chose not to restore the § 17a(2) language.

Specifically, the Commission proposed abolishing § 17a(2) as it applied to consumer debts, and replacing it instead with a "spending spree" provision that it proposed at § 4–506(a)(3) (the forerunner of current § 523(a)(2)(C)).

*Clause (2) ... of subdivision (a)* replaces § 17a(2) of the [1898 Bankruptcy] Act. *Nondischargeability under this clause does not attach to consumer debts, in recognition of the spurious use of § 17a(2) by creditors to avoid the discharge of consumer debts owed them. Clause (A) is identical to the corresponding portion of § 17a(2), except for the addition of the word "fraud," removed from § 17a(4) of the ... Act,* as explained below in the discussion of clause (5) of this subdivision. Clause (B) also makes no substantive change. The phrase of § 17a(2), concerning willful and malicious conversion of property has been removed to clause (7).

Collier on Bankruptcy App. Vol. B, pt. 4–709. (Emphasis added.)

And as the Commission proposed the retaining of § 17a(2) only as to *non-consumer debts* only, it offered the following further analysis of fiduciary frauds:

*Clause (5) of subdivision (a)* replaces § 17a(4) of the ... Act. The limiting words, "while acting as an officer or in any fiduciary capacity," the scope of

which is controverted under the ... Act, are eliminated. Thus, for example, the uncertainty whether this ground for nondischargeability applies only to a corporate or public officer or extends also to a corporate employee, partner, or other agent, compare 1A Collier ¶ 17.24, at 1707–1714.1 (1971), with Countryman, *The New Dischargeability Law,* 45 Am. Bankr.L.J. 1, 17 nn. 70–76 (1971), is abolished.

11. The terms "misappropriation" and "defalcation" are discarded as overbroad and uncertain in meaning. See *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510 (2d Cir.1937). *The standard of "fraud" is moved to a more appropriate location in clause (2),* and the precisely definable term "larceny" is added to the remaining term "embezzlement" to cover conduct clearly within the intended scope of this ground for dischargeability.

*Id.*

Thus, another non-consumer debt—fiduciary fraud—was moved from § 17a(4) into § 17a(2) (in their § 4–506(a)(2) proposal), and the word "fiduciary" was dropped so that *all frauds related only to a nonconsumer debt were covered by (a)(2).* In sum, non-consumer debts arising from false pretenses or false representations as well as non-consumer "fraud" would be covered in their proposed replacement for § 17a(2).

But limiting a(2) to non-consumer debts required that § 17a(2)'s provision for wilful and malicious conversion be moved into a broadened (a)(6) (which in proposed § 4–506 was (a)(7) because of the insertion of the "spending spree" exception as (a)(3)). Thus, both consumer debtors and non-consumer debtors alike would remain liable for any sort of wilful and malicious injury.

As the Report thus stated:

*Clause (7) of subdivision (a)* continues without substantive change § 17a(8) of the Act. The phrase "willful and malicious conversion of the property of another," now appearing at the last phrase of § 17a(2) of the Act, is reincorporated into this clause, undoing a technical change made by the 1970 Amendments to § 17a.

*Id.* at 4–710.

Congress eventually rejected the Commission's effort to abolish the § 17a(2) exception as it applied to consumer debts. Congress retained the exception as § 523(a)(2), but added § 523(d) to permit a consumer debtor who prevails in (a)(2) dischargeability litigation to recover attorney's fees and costs in some instances.[7]

When Congress thus deleted the proposed clause that took consumer debt outside the scope of the proposal (the critical clause that read *"other than a consumer debt "*), it did not also delete from the Commission's proposal the word "fraud" which had been added only to make (a)(2) a comprehensive provision addressing nonconsumer debts, such as the fiduciary frauds that had previously been addressed in § 17a(4).

Congress did re-insert the "fiduciary fraud" provision in § 523(a)(4), and it approved the Commission's relocating of the "wilful and malicious conversion" provision from a(2) to a broadened (a)(6).

Had Congress removed the word "fraud" from § 523(a)(2) that would have fully "rescued" (a)(2) from the Commission's proposed, dramatic change that would have permitted discharge of consumer-type debts incurred through fraud. But Congress instead simply announced that " 'actual fraud' is added as a ground for exception from discharge." S.Rep. No. 95–989 to accompany S. 2266, 95th Cong.2d Sess. (1978) pp. 77–80. And at 124 Cong.Rec. H 11095, H 11096, H 11113

---

7. See *American Express Travel Related Svcs. Co., Inc. v. King (In re King),* 135 B.R. 734 (Bankr.W.D.N.Y.1992); *Wegmans Food Mar-* *kets, Inc. v. Lutgen (In re Lutgen),* 225 B.R. 37 (Bankr.W.D.N.Y.1998), rev'd at 1999 WL 222605 (W.D.N.Y.1995).

(Sept. 28, 1978), Congress stated "Subparagraph (A) is intended to codify current case law, e.g. *Neal v. Clark*, 95 U.S. 704, 24 L.Ed. 586 (1877) which interprets 'fraud' to mean actual or positive fraud rather than fraud implied in law." As Judge Snow concluded, this statement by Congress was not a limitation of "false pretenses" or "false representation," but rather a limitation on the newly added term "fraud."

Given this history, there can be no statutory basis upon which to argue that Congress intended to limit prior interpretation of "false pretenses" or "false representations" to those that included the five elements of common law deceit.

Rather, I concur in Judge Snow's conclusion that the most plausible explanation for leaving "fraud" where the Commission had put it was to overrule the result of *Davison–Paxon Co. v. Caldwell, See* 115 F.2d 189 (5th Cir.1940), cert. denied, 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523, where a debt incurred through fraud was found dischargeable nonetheless, because there were no false pretenses or representations.[8]

██ Lastly (in these regards) I would note that in *In re Gilmore*, Bankruptcy Judge Benjamin Cohen took a somewhat different road to the same result. Rather than treating false pretenses and false representations as terms connoting something different from each other and from "actual fraud," Judge Cohen adopted such a broad view of "actual fraud" that he concluded that "it is essentially impossible to conceive of a set of circumstances that would constitute 'actual fraud' ... but which would not also constitute 'false pretenses,' as that term has historically been defined."

221 B.R. 864, 872 (Bankr.N.D.Ala.1998). He based this statement on his well-founded premise that " 'false pretenses' can be made in any of the ways in which ideas can be communicated." *Id.*[9]

██ Though these two approaches are very different, I find them both correct. Indeed, they reinforce each other. Whether one holds, as do Judge Cohen and I, that the term "actual fraud" encompasses not only five-pronged common law deceit, but also any device, trick, artifice or scheme to defraud,[10] or whether one instead resorts to the disjunctive structure of § 523(a)(2)(A) to determine that "false pretenses" or "false representations" alone are a sufficient basis to declare nondischargeability, totally apart from any notion as to what "fraud" requires, the result is the same—the cases that hold that the five prongs of common law deceit are always indispensable to a § 523(a)(2)(A) judgment for the plaintiff are, I submit, mistaken.

The Seventh Circuit is more adamant in its dismay at such holdings. In the case of *Mayer v. Spanel Int'l Ltd.*, the court stated that:

> Section 17a(2) of [the 1898 Act] ... forbade discharge of "liabilities for obtaining money or property by false pretenses or false representations," language that to modern ears differs from "fraud" in lacking an intent component. It turns out that cases interpreting the 1898 Act got the intent ingredient from the Bankruptcy Act of 1867, which disallowed the discharge of debts "created by fraud." ... All reference to "fraud" disappeared from the Act in 1903, but courts of appeals paid no heed.... Then the 1978 Code included both

---

**8.** State law recognized a purchase of goods on credit while knowing oneself to be insolvent as "deceit." But the Court held it to be a species of fraud or deceit that did not involve any overt pretense or representation.

**9.** Judge Cohen's analysis in *Gilmore* is as follows: a false pretense is "a series of events, activities or communications which, when considered collectively, create a false and

misleading *set of circumstances, ...* or *understanding of a transaction,* by which a creditor is wrongfully induced by a debtor to transfer property or extend credit...." 221 B.R. 864, 872, (citing *inter alia,* Black's Law Dictionary) (emphasis added).

**10.** See *Shanahan,* 151 B.R. 44 (Bankr. W.D.N.Y.1993).

fraud and the more capacious "false pretenses [or] false representation" language, *and again courts have acted as if nothing has changed. Are we to treat the evolution of statutory language as meaningless?* (Emphasis added. Citation omitted.)

51 F.3d 670, 674 (7th Cir.1995).

This writer's own modest sentiment is that whatever the law of credit card fraud "ought" to be, the law as written forbids discharge of some kinds of credit card schemes, and to command that the plaintiff prove-up the five-pronged test in every § 523(a)(2)(A) case is without any basis in the statute. Though it is odious to have to uphold some of the discovery practices of some plaintiffs like these who seemingly seek to beat-down 100 honest debtors for each one who turns out to have been a cheat,[11] appropriate management of discovery under Rule 26(b) is our job in light of cases of credit card fraud such as that present here. There is no judicially-created quick-fix that is true to the statute, in my view. Our duty is diligent, pro-active pre-trial management under Rule 26(b)(2)(iii).

## DISCUSSION OF THIS CASE

■ All bankruptcy courts would likely agree as to the result if a cardholder were to hand her card over to her husband and say "Go run this up. I'll help you. Here is my PIN number. Take all the cash advances you can. I'll sign the pre-printed checks in blank. Then we'll file bankruptcy and I'll claim that I thought we could afford it because you handled the family finances not me. They can't sue you, because you are not liable on the account."

Whatever else that might be, it would be a wilful and malicious injury under 11 U.S.C. § 523(a)(6).

The only difference between that hypothetical and the facts before the court are (1) the defendant claims that by virtue of her upbringing and by choice, she was oblivious to the fact that this and other accounts were being run up over $70,000 in a span of less than a year, and (2) she and her husband deny having contemplated bankruptcy until after the run-up. And those differences preclude a finding of "willful and malicious" injury.

■ In this writer's view, there is something short of a "wilful and malicious" injury that constitutes a "false pretense" or "actual fraud" and it is present in this case. Taking all of the defense testimony as true (and as noted above, some of these debtors' testimony strains credulity), this writer holds that a credit card issuer does not "assume the risk" that a cardholder will empower and assist someone else to run up the cards and then, after filing bankruptcy, be able to sustain a claim that having chosen to act deaf, dumb, and blind is a complete defense to a § 523(a)(2)(A) action.

There is a "false pretense" when the account holder who is under no duress whatsoever, aided and facilitated her husband's use of the card with complete and utter disregard (on her part) for how it was being used and for the ability to repay it.

Although genuine mental impairment might defeat a claim of fraud,[12] this Court holds that a premeditated, calculated ignorance, coupled with active participation and assistance in the use of credit line by someone else, while the account holder is

11. See *First Deposit Nat'l Bank v. Stahl (In re Stahl)*, 222 B.R. 497 (Bankr.W.D.N.C.1998) for a description of the type of discovery disputes an honest debtor who does not capitulate may be in for.

12. It is a matter of record, reported in the daily news of this city, that a number of

functionally-disabled, mentally-impaired persons living in a group home received preapproved credit cards and had run up significant debts ($4,000 or $5,000) before care givers discovered the cards and explained to the recipients that this was not a public assistance program that was free.

insolvent in fact, belies any defense of "intent to repay." This defendant's self-serving protestations of actual intent to repay are of no weight against the backdrop of complete indifference to what was being charged to her name.

Indifference is not the same as misplaced confidence. Misplaced confidence might be among the mistakes or lapses of judgment that bankruptcy forgives.[13] Misplaced confidence might be found where a debtor knows how high the debt has become, but accepts a spouse's promise, backed-up with voluntary counseling, to clean up his act or his vow and demonstrated effort to work extra hours to repay their debt.

Indifference is not the same as desperation or submissiveness, either. An abused spouse, or one who fears that the family unit will fall apart if she cuts up the card, might have a defense, at least up until what the spouse is doing approaches outright thievery. (Even if Bonnie were to have assisted Clyde only to keep peace in the relationship, her actions would not have been without culpability.)

To be sure, a lender to one spouse must assume the risk that the other spouse's failings or addictions or injuries, etc. might cause its borrower to use the card to excess. But ultimately the judgment at issue under § 523 is the debtor's judgment. Had this defendant taken some modicum of responsibility for knowing what "she" owed, she may or may not have aided or abetted the run-up. And she may or may not have prevailed in dischargeability litigation grounded in that exercise of judgment. But she may not pre-empt such inquiry, and defeat liability, by claiming that she delegated that judgment to her husband.[14]

In sum, the defendant's conduct here constitutes a "false pretense." The language used by Bankruptcy Judge Cohen, quoted earlier in this decision, is appropriate. The defendant engaged in "a series of ... activities ... which, when considered collectively, [served to] create a false and misleading set of circumstances, or a false and misleading understanding of a transaction." Specifically, the plaintiff clearly approved each of the pertinent transactions on an inescapable belief that it was the judgment and discretion of the defendant that was being exercised regarding the use of the account, when, in fact, the judgment and discretion that was being exercised was that of someone against whom the plaintiff has no rights.[15]

### STARE DECISIS REVISITED: THE DECISION OF A SOLE DISTRICT JUDGE IN *In re Lutgen*

Since this writer ruled in *Phipps* that within the Second Circuit, a decision of just one U.S. District Judge binds all U.S. Bankruptcy Judges of that District until a different District Judge or a higher court reaches a different conclusion, at least two courts have declined to adopt that view. See, e.g. *In re Raphael*, 230 B.R. 657, 665 (Bankr.D.N.J.1999); *Barnett v. Jamesway Corp. (In re Jamesway)*, 235 B.R. 329, 336, n. 1 (Bankr.S.D.N.Y.1999).

---

**13.** "The issuer or a credit card or credit line perhaps assumes the risk of the user's ignorance, mistake, naivete, gullibility, misfortune, or other innocent failing or adversity...." *In re Shanahan*, 151 B.R. 44 (Bankr. W.D.N.Y.1993).

**14.** Falling for "role-playing" is a danger here. How many who might be inclined to disagree with today's decision would do so if the defendant were a husband who had relegated judgment over his accounts to his profligate wife? Indeed, the defense that "I was raised that way" might appropriately be viewed as an insult to millions of married women who accept responsibility for their husbands' gross abuses of their wives' credit. Though arguments are not to be rejected merely because they might insult millions, there can be a nexus between a socially indefensible premise and a "false pretense."

**15.** I find the "inescapable belief" to flow from the fact that the plaintiff clearly would have canceled the card if the defendant had reported it "stolen" by her husband or had at least reported it or the convenience checks "lost."

The present case may or may not expose a flaw in those courts' reasoning.

This writer ruled in *Lutgen* that a creditor who prevails in 11 U.S.C. § 523(a)(2)(A) litigation is not entitled to attorneys' fees incident to that litigation, in the absence of a statute, or other basis, abrogating the American Rule. See 225 B.R. 37, 39–41. (That there was such a statute in *Cohen v. De La Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 1214, 140 L.Ed.2d 341, was fully discussed in this Court's *Lutgen* decision.)

U.S. District Court Judge John T. Elfvin, of this U.S. District Court, squarely reversed that decision on the merits, ordering the opposite result. See *In re Lutgen*, 1999 WL 222605 (W.D.N.Y. April 5, 1999). As proper format would say, "the U.S. District Court (Elfvin, J.) reversed," and the basis of the reversal was the District Court's finding that I erred in concluding that the contractual obligation to pay attorney's fees was discharged and no longer at issue when the § 523(a)(2)(A) fraud was tried and proven.

If the courts that believe that the *In re Phipps* holding is wrong are correct, then I am free to disregard a sole District Judge's explanation as to why I wrongly decided *In re Lutgen;* I may re-issue my now-reversed *Lutgen* holding in the context of the present case; and I may hope that any appeal goes to a different District Judge—one who might agree with me.

I presume that that is precisely what the courts that disagree with *In re Phipps* would do in my situation (if they do not find the reviewing court's teaching to be persuasive). Certainly they could not say that the bankruptcy judge who was reversed is bound, but the other bankruptcy judges are not; their key argument is that

there is no "law of the district," or that "law of the district" cannot be made on the basis of the random selection of a district judge on appeal. That argument collapses if they were to concede that the random assignment of a case to a particular bankruptcy judge who happens to be the one whose decision was reversed, does require obedience to the earlier decision of the district judge who issued the reversal.

I have made no effort to ascertain whether those courts feel that a bankruptcy judge is free to reaffirm, in a different case, a ruling that was specifically reversed in an earlier case decided by that same bankruptcy judge. Perhaps they do so feel free. If not, then their arguments in contradiction to *Phipps* are flawed.

■ I, on the other hand, am comfortable with holding that the result of *In re Phipps*, is particularly compelling when the single district judge's holding was rendered in the form of a reversal of the same bankruptcy judge who is now deciding, in a different case, whether he or she must give *stare decisis* effect to the district judge's decision.

As explained in *Phipps*, this writer is of the view that (1) any one district judge speaks for the district court, (2) however many judges thereof have ruled, the district court has ruled, (3) the district court is "superior" to the bankruptcy court, that (4) every judge of an "inferior" court must adhere to the decision of the "superior" court, and that (5) within the Second Circuit, this interpretation of hierarchical *stare decisis* is commanded by the Circuit's decision in *United States v. Whiting Pools, Inc.*, 674 F.2d 144 (2d Cir.1982), affd. on other grounds, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).[16]

---

**16.** As noted in *Arway v. Mt. St. Mary's Hospital (In re Arway)*, some have described the failure of an inferior court to apply hierarchical *stare decisis* as "anarchy." See *Arway*, 227 B.R. 216, 219, n. 3 (Bankr.W.D.N.Y. 1998). More prosaically, the orderly development of law is best served by the rule reaffirmed here, in my view. That is because under *In re Phipps*, the rule to be applied in any case does not depend upon which bankruptcy judge is assigned. A party need fear (or anticipate) a different rule only at the time a district judge is assigned the appeal.

## CONCLUSION

Judgment will enter for the plaintiff for the amount demanded in the Complaint. However, the Clerk shall not enter judgment until the matter of plaintiff's attorneys fees has been addressed pursuant to the District Court's *Lutgen* decision. If plaintiff intends to seek fees thereunder, it shall do so by Motion and Notice of Motion filed and served within 15 days from the date of this Order. Any such Motion shall include proof of whatever contractual basis plaintiff asserts gives rise to the right to attorney's fees.

SO ORDERED.